STATE OF NORTH CAROLINA v. KEVIN DOUGLAS JONES

No. 218A00

(Filed 1 February 2002)

## 1. Jury— selection—capital trial—death penalty views—challenge for cause—assessment of judge

The trial court did not abuse its discretion in a capital trial for first-degree murder by excluding a prospective juror based upon her responses to death penalty questions where the prospective juror expressed a straightforward, religion-based opposition to the death penalty, gave further equivocal answers about following the law, and continued to state that her religious beliefs would impair her ability to be a fair juror. The judge gave counsel wide latitude during a lengthy questioning period, asked questions himself, assessed the prospective juror's responses for the overall effect, and made a decision based on his firsthand impressions.

## 2. Jury— selection—capital trial—death penalty views—firm opinions opposing—rehabilitation denied

The trial court did not abuse its discretion in a capital prosecution for first-degree murder when it denied defendant the opportunity to question a juror who was excused for cause. The potential juror's answers to general questions about capital punishment consistently reflected both her opposition to the death penalty and a steadfast recalcitrance towards imposing it, the transcript reveals nothing that indicates any inclination to alter or soften her views, and defendant did not proffer any arguments suggesting that his questions might produce different answers.

## 3. Criminal Law— instructions—reasonable doubt—more than an academic doubt

There was no plain error in a capital first-degree murder prosecution in the trial court's instruction defining reasonable doubt as not being an "academic" doubt. Defendant's argument has been rejected consistently.

## 4. Trials— closing arguments—standards

A lawyer's function during closing argument is to provide the jury with a summation of the evidence. The argument should be

limited to relevant legal issues and the standards articulated in N.C.G.S. § 15A-1230(a) are applicable to civil as well as criminal cases. The attorney may not become abusive, express his personal belief as to the truth or falsity of the evidence, express his personal belief as to which party should prevail, or make arguments premised on matters outside the record. Trial judges have a two-fold responsibility as overseers of the courts to diligently ensure that attorneys honor their professional obligations and to take appropriate action against opportunists who purposely venture to violate courtroom protocol. Moreover, bearing in mind the reluctance of counsel to interrupt and object during closing argument for fear of incurring jury disfavor, it is incumbent on the trial court to monitor vigilantly the course of arguments, to intervene as warranted, to entertain objections, and to impose remedies pertaining to those objections, including requiring the attorneys to retract improper arguments and instructing the jury to disregard such arguments.

**5. Sentencing— capital—prosecutor's argument—invocation of Columbine and Oklahoma City**

The trial court in a capital sentencing proceeding abused its discretion by allowing a closing argument which linked the tragedy of the victim's death to the tragedies of Columbine and Oklahoma City. The argument was improper because it referred to events and circumstances outside the record, urged jurors by implication to compare defendant's acts with the infamous acts of others, and attempted to lead jurors away from the evidence by appealing instead to their sense of passion and prejudice.

**6. Sentencing— capital—prosecutor's argument—defendant lower than dirt on a snake**

The prosecutor's closing argument in a capital sentencing proceeding was grossly improper and prejudicial where the prosecutor said of defendant, "You got this quitter, this loser, this worthless piece of—who's mean . . . He's as mean as they come. He's lower than the dirt of a snake's belly." The prosecutor's repeated degrading comments about defendant shifted the focus from the jury's opinion of defendant's character and acts to the prosecutor's opinion, offered in the form of conclusory name-calling, and were purposely intended to deflect the jury from its proper role as fact-finder by appealing to passion and prejudice.

7. **Sentencing— capital—prosecutor's argument—improper— standards**

The trial court abused its discretion by allowing a prosecutor undue latitude in a capital sentencing proceeding. An improper argument that was not prejudicial at the guilt phase may be prejudicial during a capital sentencing proceeding, which by its nature involves evidence of defendant's character. It is appropriate for the closing argument in a capital sentencing proceeding to incorporate reasonable inferences and conclusions about defendant drawn from the evidence presented, but conclusory arguments that are not reasonable or that are premised on matters outside the record (such as the name calling and comparisons to infamous acts in this case) cannot be countenanced. An argument must be devoid of counsel's personal opinion, avoid name calling and references to matters beyond the record, be premised on logical deductions rather than appeals to passion or prejudice, and be constructed from fair inferences drawn only from evidence properly admitted at trial.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Greeson, J., on 21 April 2000 in Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 17 April 2001.

*Roy Cooper, Attorney General, by David F. Hoke, Assistant Attorney General, and William P. Hart, Special Deputy Attorney General, for the State.*

*J. Clark Fischer for defendant-appellant.*

ORR, Justice.

In a superseding indictment issued on 30 August 1999, defendant was charged with the first-degree murder of Ronald Ray Mabe. He was tried capitally at the 10 April 2000 Criminal Session of Superior Court, Forsyth County. The jury found defendant guilty of first-degree murder on three theories—premeditation and deliberation, felony murder, and lying in wait—and, on 21 April 2000, after a capital sentencing proceeding, recommended a sentence of death. The trial judge entered judgment accordingly, and defendant filed a timely notice of appeal to this Court.

STATE v. JONES

[355 N.C. 117 (2002)]

After consideration of the questions presented by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we find: (1) no error meriting reversal of defendant's conviction, and (2) reversible error in defendant's capital sentencing proceeding. As a consequence of so holding, it is unnecessary for us to address at this time defendant's additional contention that his death sentence was disproportionate.

Evidence presented during the guilt portion of the trial tended to show that on the evening of 9 November 1998, defendant went to the home of a friend, Samuel Evans, Jr. Defendant told Evans he had traded his car to Evans' brother for some crack cocaine. The two then proceeded to smoke the drugs in one of Evans' cars, which was parked on the property. After consuming the contraband, defendant apparently became concerned that his grandfather would be upset over the loss of his car and that he needed to get it back. He told Evans that he was going to his uncle's house to see "if [he] could borrow some money or something," and he left. Evans testified that he did not know if the victim, Ronald Mabe, was in fact defendant's uncle, but he knew defendant was referring to Mr. Mabe, who lived nearby.

Lynda Reed lived with defendant's father in Albertville, Alabama, in November of 1998. She testified that defendant arrived at their home on 18 November, and that the two had a conversation about Mr. Mabe. According to Ms. Reed, defendant asked if she knew that Mr. Mabe was dead, and she told him "no." When she asked what had happened to Mr. Mabe, defendant started to cry and said, "It was me. I am the one who killed him." After defendant recounted his involvement with Mr. Evans on 9 November, he told Ms. Reed that he went to Mr. Mabe's home because he knew that Mr. Mabe kept money there. He said he planned "to take what he could" in order "to get money for more crack and to get his car back." He then told Ms. Reed that while he was on the way to Mr. Mabe's home, he picked up a two-by-four he found on the side of the road. Ms. Reed further testified that defendant told her that he proceeded to the Mabe home and that he initially struck the victim with the two-by-four when Mr. Mabe answered the door. After the victim fell and began to scream, defendant said he became frightened that someone might hear the commotion, so he struck Mr. Mabe again. According to Ms. Reed, defendant said he struck Mr. Mabe three times in all, and told her that when the victim was finally rendered helpless, defendant took Mr. Mabe's wallet and a handgun hidden under a bed mattress. Other evidence at trial

showed that defendant returned to the Evans residence shortly after the murder and that defendant and Evans traded the stolen gun for crack cocaine later that same night.

Upon hearing defendant's story, Ms. Reed told defendant's father that defendant could not remain in the house. Defendant and his father left shortly thereafter. Ms. Reed later informed the local police about what defendant had told her.

The victim's wallet was later found in a wooded area not far from his home. Police also seized a bloody two-by-four from behind a neighbor's woodshed. A forensic serologist determined that the bloodstains on the wood were of human blood, and a forensic chemist concluded that at least one of two hairs found on the wood. were "microscopically consistent with the head hair of Ronald Mabe." Other expert testimony offered by the State tended to show that the victim died of blunt trauma to the head, and that the victim had sustained a series of blunt-trauma injuries. The injuries were consistent with being struck numerous times by a two-by-four.

On appeal to this Court, defendant brings forth eleven questions for review—three dealing with the guilt-innocence portion of his trial, and eight dealing with his sentencing proceeding, including proportionality review.

### Jury Selection and Guilt-Innocence Phase Issues

[1] Defendant first contends that he was prejudiced by the exclusion of a prospective juror based upon her responses to questions about her opposition to the death penalty and her apparent inability to impose such a sentence. In defendant's summary view, the *voir dire* of venire woman Karen Strausser failed to demonstrate she would be unable to meet her obligations as a capital juror and that, as a consequence of such failing, her dismissal from the jury panel was improper. We disagree.

The test for determining when a prospective juror may be excused for cause is whether his or her views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 849 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). Although the fact that a prospective juror voiced reservations about capital punishment or expressed conscientious or religious scruples against its imposition is not, in itself, a sufficient basis for excusal, *see*

*Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 785 (1968), we note that the final decision to excuse a prospective juror is within the discretion of the trial court because " 'there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law,' " *State v. Nobles*, 350 N.C. 483, 495, 515 S.E.2d 885, 893 (1999) (quoting *Wainwright*, 469 U.S. at 425-26, 83 L. Ed. 2d at 852); *see also* N.C.G.S. § 15A-1212(8) (1999) (providing that a challenge for cause may be made on the grounds that a juror would be unable to render a verdict in accordance with the laws of North Carolina). Moreover, in a case in which a prospective juror's responses were "at best equivocal," this Court concluded that it "must defer to the trial court's judgment as to whether the prospective juror could impartially follow the law." *State v. Bowman*, 349 N.C. 459, 471, 509 S.E.2d 428, 436 (1998), *cert. denied*, 527 U.S. 1040, 144 L. Ed. 2d 802 (1999).

The juror in question here, Ms. Strausser, was questioned at length by the attorneys for both parties about both her feelings regarding the death penalty and her ability to render a decision that complied with the law. From the outset, Ms. Strausser expressed a straightforward opposition to capital punishment in general and explained that it was religion-based. Nevertheless, when asked whether she could set aside her sentiments and faithfully apply the law, Ms. Strausser initially told the court that she could "if [she] had to." Further inquiry into the matter by the trial judge, the defense, and the prosecution revealed a number of ambivalent, if not contradictory, responses. At one point, Ms. Strausser said that "if [she] had to choose the death penalty, then, by law, [she'd] have to do it"—ostensibly, a qualifying answer. However, she also expressed her opposition to the death penalty numerous times, explained that she would have problems living with herself if she imposed such a penalty, and stated more than once that her religious beliefs would impair her ability to be a fair juror. Moreover, when asked if she would always vote for life imprisonment, Ms. Strausser nodded affirmatively.

Ultimately, the equivocating nature of her responses, in light of the "totality of what she said," led the trial judge to conclude that Ms. Strausser "would be unable to faithfully and impartially apply the law in this case." Consequently, he allowed the State's challenge for cause. *See State v. Smith*, 352 N.C. 531, 545, 532 S.E.2d 773, 783 (2000) (holding that the question of whether a juror's bias makes him excusable for cause is "the court's decision, in the exercise of

its sound discretion and judgment"), *cert. denied,* —— U.S. ——, 149 L. Ed. 2d 360 (2001). We find nothing in the record suggesting that the trial judge abused the discretion accorded him under the circumstances. Amid a lengthy questioning period, he afforded counsel wide latitude, asked questions himself, assessed the prospective juror's responses for their overall effect, and made a decision based on his firsthand impressions. Thus, absent any evidence of discretionary abuse, "we must defer to the trial court's judgment as to whether the prospective juror could impartially follow the law." *Bowman,* 349 N.C. at 471, 509 S.E.2d at 436. As a result, we conclude that defendant's assignment of error on this issue is without merit.

[2] Defendant next argues that the trial court erred when it denied defendant the opportunity to question a juror who was excused for cause. In sum, defendant concludes that the prospective juror, Vicki Kelley, had not expressed an unequivocal opposition to the death penalty during questioning by the prosecution, and thus she was eligible for rehabilitative questioning by the defense. We disagree with both contentions.

A capital defendant is not entitled to rehabilitate a prospective juror if such juror has "expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court." *State v. Cummings,* 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). Moreover, "[w]hen challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged." *State v. Oliver,* 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981). Thus, in order to determine whether the trial judge in the case *sub judice* abused his discretion by not permitting defendant an opportunity to question Ms. Kelley before granting the State's challenge for cause, we must decide: (1) if her answers and statements to the State's questions amounted to an expressed unequivocal opposition to the death penalty, and (2) if there was any showing that further questioning by defendant would have produced different answers from the prospective juror.

During questioning by the State, Ms. Kelley stated that she did not think she could fairly and impartially consider the death penalty as punishment. She said that her view was based on her personal beliefs, and that the death penalty seemed contradictory to what she

had learned during twenty-five years of practice as a nurse. And while Ms. Kelley at one point said she "hoped" she could follow the law, she also said she would "probably not" be able to give equal considera- tion to a death penalty option. Perhaps most telling of all was Ms. Kelley's response to the court's inquiry into the case's proper legal standard. When asked whether her views about the death penalty would prevent or substantially impair the performance of her duties as a juror, Ms. Kelley replied, "Yes. In light of how you worded it, yes." Immediately after that response, the court excused the juror and denied defendant's request to question her.

In our view, the trial court did not exceed its discretionary pow- ers by allowing Ms. Kelley to be excused without further questioning. Her answers to general questions about capital punishment consist- ently reflected both her opposition to the penalty and a steadfast recalcitrance towards imposing it. Moreover, when asked point blank if her views would prevent or substantially impair the performance of her duties as a juror, her reply was a definitive "yes."

Ms. Kelley's final response, by itself, is not necessarily dispositive in determining her perspective on the issue. However, when viewed in context, as a summary culmination of her previous answers and statements, the reply can hardly be construed as anything but an expression of Ms. Kelley's "unequivocal opposition to the death penalty." Cummings, 326 N.C. at 307, 389 S.E.2d at 71. We note, too, that after Ms. Kelley was excused, the defense asked merely for an opportunity to question the juror. Defendant proffered no accompa- nying argument suggesting that his questions might produce different answers from Ms. Kelley, and our independent review of the tran- script reveals nothing that indicates any inclination on her part to alter, or even soften, her views. Thus, in sum, we hold that the prospective juror's statements constituted an expression of unequiv- ocal opposition to the death penalty, and that there was an "absence of a showing that further questioning by defendant would likely have produced different answers." Oliver, 302 N.C. at 40, 274 S.E.2d at 191. As a result, we conclude the trial judge did not abuse his discretion by excusing the prospective juror when he did. Defendant's claim to the contrary, therefore, is deemed to be without merit.

[3] In his final argument concerning guilt-phase issues, defendant contends the trial court committed plain error by defining reasonable doubt in a manner that was legally incorrect and that lowered the State's burden of proof. More specifically, defendant takes issue with the trial court's explanation that reasonable doubt is "not a mere pos-

sible [doubt], it's not an academic [doubt], and it's not a forced doubt." In defendant's view, the trial court, by defining reasonable doubt as not an "academic" doubt, impermissibly lowered the prosecution's constitutional burden of proof. We disagree.

In preamble to discussion of defendant's substantive argument, we note defendant failed at trial to object to the instruction as given. The North Carolina Rules of Appellate Procedure set forth the necessary procedure for preserving jury instruction issues for appellate review:

A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objections; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2).

Thus, as defendant did not object to the instruction at trial, he has failed to properly preserve the issue for review by this Court. *See generally* N.C. R. App. P. 10(b)(1). Defendant also made no constitutional claims at trial regarding the instruction in question and therefore will not be heard on any constitutional grounds here. *See State v. Benson*, 323 N.C. 318, 321-22, 372 S.E.2d 517, 518-19 (1988). As a result of the foregoing, our review of the record is limited to determining whether the giving of the instruction in question amounted to plain error. *See* N.C. R. App. P. 10(c)(4); *State v. Hardy*, 353 N.C. 122, 131, 540 S.E.2d 334, 342 (2000), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3235 (2001). Under a plain error analysis, defendant is entitled to a new trial only if the error was so fundamental that, absent the error, the jury probably would have reached a different result. *See State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). Moreover, we remain mindful that "when the 'plain error' rule is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 378 (1983) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)).

As for defendant's substantive contention, this Court has consistently rejected defendant's argument that the trial court's comparative

reference to "academic" doubt was improper. In fact, this very issue was argued and decided against defendant's position in a case recently heard by this Court. *See State v. Hooks*, 353 N.C. 629, 634-35, 548 S.E.2d 501, 506 (2001) (holding that it was not improper for trial court to define reasonable doubt as not, *inter alia*, an academic doubt); *see also State v. Conner*, 335 N.C. 618, 636-38, 440 S.E.2d 826, 836-37 (1994) (approving an instruction defining reasonable doubt as "not a mere vain, fanciful, academic or forced doubt"); *State v. Adams*, 335 N.C. 401, 420-21, 439 S.E.2d 760, 770 (1994) (approving the trial court's definition of reasonable doubt as one that is "not a mere possible, fanciful or academic doubt"). As a result, we conclude that defendant has failed to demonstrate any error at all, much less error that was so fundamental that, absent such error, the jury probably would have reached a different result. *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468 (holding that "[a] prerequisite to our engaging in a 'plain error' analysis is the determination that the instruction complained of constitutes 'error' at all"), *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d 77 (1986). Accordingly, defendant's contentions regarding the instruction on reasonable doubt are without merit.

## Sentencing Issues

### I.

[4] In assignments of error concerning his sentencing hearing, defendant argues, *inter alia*, that portions of the State's closing argument were so grossly improper that the trial court committed reversible error by: (1) failing to sustain defendant's objection to the State's comparative references to the Columbine school shooting and the Oklahoma City bombing, and (2) failing to intervene *ex mero motu* when the State disparaged defendant by engaging in name-calling and personal insults. We agree with both contentions, and note from the outset that the issue of improper closing arguments has become a mainstay, if not a troublesome refrain, in cases before this Court. In virtually every capital case, many other criminal cases, and a growing number of civil cases, this issue is being vigorously advocated as grounds for reversible error. Therefore, we take this opportunity to revisit in some detail: (1) the limits of proper closing argument, (2) the professional and ethical responsibility of attorneys making such arguments, (3) the duty of our trial judges to be diligent in overseeing closing arguments, and (4) the possible ramifications for failing to keep such arguments in line with existing law.

**STATE v. JONES**

[355 N.C. 117 (2002)]

A lawyer's function during closing argument is to provide the jury with a summation of the evidence, *Herring v. New York*, 422 U.S. 853, 861-62, 45 L. Ed. 2d 593, 599-600 (1975), which in turn "serves to sharpen and clarify the issues for resolution by the trier of fact," *id.* at 862, 45 L. Ed. 2d at 600, and should be limited to relevant legal issues. *See State v. Allen*, 353 N.C. 504, 508-11, 546 S.E.2d 372, 374-76 (2001). Closing argument is a "reason offered in proof, to induce belief or convince the mind," 2 R.C.L. *Arguments of Counsel* § 1, at 404 (1914), and "[t]he sole object of all [such] argument is the elucidation of the truth," *id.*

In the context of a criminal jury trial, specific guidelines for closing argument have been set out by the General Assembly:

> (a) During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.

N.C.G.S. § 15A-1230(a) (1999). While this statutory provision is applicable to jury trials in criminal cases, the standards articulated are likewise applicable in civil cases. In closing arguments to the jury, an attorney may not: (1) become abusive, (2) express his personal belief as to the truth or falsity of the evidence, (3) express his personal belief as to which party should prevail, or (4) make arguments premised on matters outside the record.

If attorneys were to scrupulously comply with these seemingly simple requirements, then the issue of alleging improper arguments on appeal would prove an exception instead of the rule. Regrettably, such has not been the case; in fact, it appears to this Court that some attorneys intentionally "push the envelope" with their jury arguments in the belief that there will be no consequences for doing so. *See, e.g.*, *State v. Call*, 353 N.C. 400, 419, 545 S.E.2d 190, 202-03, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3360 (2001).

In considering the professional obligation of counsel, we call attention to Rule 12—"Courtroom decorum"—in the General Rules of Practice for the Superior and District Courts, which provides, in pertinent part: "Abusive language or offensive personal references are

prohibited," "[t]he conduct of the lawyers before the court and with other lawyers should be characterized by candor and fairness," and "[c]ounsel are at all times to conduct themselves with dignity and propriety." Gen. R. Pract. Super. and Dist. Ct. 12, paras. 7, 8, 2, 2002 Ann. R. N.C. 10. Further, the Rules of Professional Conduct of the North Carolina State Bar provide in the preamble that "[a] lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." R. Prof. Conduct N.C. St. B. 0.1 preamble, para. 1, 2002 Ann. R. N.C. 560. Professional conduct Rule 3.4(e), meanwhile, provides additional guidance; it requires that a lawyer *shall not,*

> in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, . . . or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused.

R. Prof. Conduct N.C. St. B. 3.4(e), 2002 Ann. R. N.C. 630.

We do not imply that every improper argument necessarily constitutes a violation of these rules of professional practice and conduct; rather, we emphasize that attorneys appearing before our courts are expected, *at a minimum*, to conduct themselves in accordance with such rules. In a similar vein, trial judges have a two-fold responsibility as overseers of our courts: (1) to diligently ensure that attorneys honor the aforementioned professional obligations, and (2) to take appropriate action against opportunists who purposely venture to violate courtroom protocol. *See, e.g., Couch v. Private Diagnostic Clinic*, 351 N.C. 92, 520 S.E.2d 785 (1999) (remanding case to trial court for hearing to determine sanctions against the offending attorney); *see also Couch v. Private Diagnostic Clinic*, 147 N.C. App. ——, 554 S.E.2d 356 (2001) (upholding trial court sanctions against attorney who violated rules of professional conduct during closing arguments at trial; sanctions included suspension of the attorney's practicing privileges for a year and a $50,000-plus penalty).

In considering specific cases of improper argument, we acknowledge our oft-quoted refrain—"that counsel are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *See, e.g., State v. Richardson*, 342 N.C. 772, 792-

STATE v. JONES

[355 N.C. 117 (2002)]

93, 467 S.E.2d 685, 697, *cert. denied,* 519 U.S. 890, 136 L. Ed. 2d 160 (1996). However, "wide latitude" has its limits. In *Couch,* the attorney in question "engaged in a grossly improper jury argument that included at least nineteen explicit characterizations of the defense witnesses and opposing counsel as liars." 351 N.C. at 93, 520 S.E.2d at 785. While our divided Court did not grant the defendant-hospital a new trial, the Court unanimously remanded the case to the trial court for the determination of the appropriate sanction, holding that the attorney's conduct violated Rule 12 of the General Rules of Practice for the Superior and District Courts and was not in conformity with the Rules of Professional Conduct. *Id.*

With regard to criminal cases, this Court has on numerous occasions found closing arguments to be outside the bounds of propriety, with varying consequences. For some violations—those in which the defendant failed to object or that lacked a definitive showing of prejudice caused by the improper argument—we have opted to warn or discipline the offending attorney in lieu of awarding a new trial. *See, e.g., State v. Gell,* 351 N.C. 192, 216, 524 S.E.2d 332, 347 (affirming this Court's long-held view that it is improper for prosecutors to make Bible-based arguments to the jury), *cert. denied,* 531 U.S. 867, 148 L. Ed. 2d 110 (2000). However, in cases of clear-cut violations—those couched as appeals to a jury's passions or that otherwise resulted in prejudice to a defendant—this Court has not hesitated to overturn the results of the trial court. *State v. Smith,* 279 N.C. 163, 165-67, 181 S.E.2d 458, 459-60 (1971) (reversing defendant's rape conviction because of the prosecutor's "inflammatory and prejudicial" closing argument, in which the prosecutor described defendant as "lower than the bone belly of a cur dog"); *see also State v. Miller,* 271 N.C. 646, 659-61, 157 S.E.2d 335, 344-47 (1967) (holding that the prosecutor committed reversible error by, *inter. alia,* calling defendants "storebreakers" and expressing his opinion that a witness was lying).

As for the effect of a defendant's failure to object to improper remarks, this Court is mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor. Thus, it is incumbent on the trial court to monitor vigilantly the course of such arguments, to intervene as warranted, to entertain objections, and to impose any remedies pertaining to those objections. Such remedies include, but are not necessarily limited to, requiring counsel to retract portions of an argument deemed improper or issuing instructions to the jury to disregard such arguments.

In sum, with regard to the substantive analysis pertaining to the limits of closing argument, we note that Justice Carlisle W. Higgins, while writing for a unanimous Court in *State v. Smith*, 279 N.C. 163, 181 S.E.2d 458, some thirty years ago, articulated precisely what this Court is now reiterating. We quote in its entirety the substantive portion of that opinion:

> The foregoing are the more flagrant of the solicitor's transgressions. Too much of his argument, however, was pitched in the same tone. When the prosecutor becomes abusive, injects his personal views and opinions into the argument before the jury, he violates the rules of fair debate and it becomes the duty of the trial judge to intervene to stop improper argument and to instruct the jury not to consider it. Especially is this true in a capital case. When it is made to appear the trial judge permitted the prosecutor to become abusive, to inject his personal experiences, his views and his opinions into the argument before the jury, it then becomes the duty of the appellate court to review the argument. "In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence." *Berger v. United States*, 295 U.S. 78, 89, 79 L. Ed. 1314[, 1321 (1935)].

> In *State v. Miller*, 271 N.C. 646, 157 S.E.2d 335 (also a Mecklenburg County case), Chief Justice Parker for this Court said: "It is especially proper for the court to intervene and exercise power to curb improper arguments of the solicitor when the State is prosecuting one of its citizens, and should not allow the jury to be unfairly prejudiced against him."

> Pertinent to the present inquiry is the opinion of Mr. Justice Sutherland in *Berger v. United States*, [295 U.S. at 88, 79 L. Ed. at 1321]:

>> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike

foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

*Smith*, 279 N.C. at 166-67, 181 S.E.2d at 460 (citations omitted).[1]

## II.

[5] The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection. *See, e.g., State v. Huffstetler*, 312 N.C. 92, 111, 322 S.E.2d 110, 122 (1984) (holding that appellate courts will review the exercise of such discretion when counsel's remarks are extreme and calculated to prejudice the jury); *see also State v. Riddle*, 311 N.C. 734, 738, 319 S.E.2d 250, 253 (1984). In order to assess whether a trial court has abused its discretion when deciding a particular matter, this Court must determine if the ruling "could not have been the result of a reasoned decision." *State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996). Thus, the question before us is whether the trial court failed to make a reasoned decision when it overruled defendant's timely objection to the prosecutor's references to the Columbine school shooting and the Oklahoma City bombing.

When applying the abuse of discretion standard to closing arguments, this Court first determines if the remarks were improper. As demonstrated in part I of this opinion, improper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others. Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court. *See Coble v. Coble*, 79 N.C. 589 (1878) (holding that it is reversible error

---

1. Joining Justice Higgins in the decision were Chief Justice William H. Bobbitt, Associate Justices (and future Chief Justices) Susie Sharp and Joseph Branch, I. Beverly Lake, J. Frank Huskins, and (former Governor) Dan K. Moore.

**STATE v. JONES**

[355 N.C. 117 (2002)]

if the trial court, upon defendant's objection, fails to prevent opposing counsel from unduly humiliating and degrading defendant); *and Tyson*, 133 N.C. at 698, 45 S.E. at 840 (holding that when counsel grossly abuse their privilege of closing arguments, the "presiding judge should interfere at once, when objection is made at the time, and correct the abuse").

We now must apply the above standard of review to the case at bar. In this assignment of error, defendant ultimately contends that, over his objection, the prosecutor, in his closing argument, improperly and prejudicially referred to the "Columbine [school] shootings" and the "Oklahoma City [federal building] bombing[]" as examples of national tragedies.[2] In our view, such remarks cannot be construed as anything but a thinly veiled attempt to appeal to the jury's emotions by comparing defendant's crime with two of the most heinous violent · criminal acts of the recent past. Thus, the argument was improper for at least three reasons: (1) it referred to events and circumstances outside the record; (2) by implication, it urged jurors to compare defendant's acts with the infamous acts of others; and (3) it attempted to lead jurors away from the evidence by appealing instead to their sense of passion and prejudice.

The impact of the statements in question, which conjure up images of disaster and tragedy of epic proportion, is too grave to be easily removed from the jury's consciousness, even if the trial court had attempted to do so with instructions. Moreover, the offensive nature of the remarks exceeds that of other language that has been tied to prejudicial error in the past. *See, e.g., State v. Wyatt*, 254 N.C. 220, 222, 118 S.E.2d 420, 421 (1961) (holding that a prosecutor who

---

2. The pertinent portion of the prosecutor's analogy in closing argument reads as follows:

Ms. STANTON: Thank you, judge. The United States of America, a great country, indeed around the world for its freedoms: freedom of speech, freedom of privacy in your own home. But with those freedoms comes individual responsibility that every citizen of this country must realize; that to have these freedoms, one is responsible for their own conduct; one is responsible for their own behavior.

A year ago the Columbine shootings; five years ago Oklahoma City bombings. When this nation faces such tragedy—

MR. FINE: Objection.

THE COURT: Overruled.

Ms. STANTON: —the laws of this country come in to bring order to that tragedy, to speak to that tragedy. Here we are addressing a tragedy of a man's life. The tragedy not of this defendant, the tragedy of [the victim] Ronald Ray Mabe. . . .

described defendants as "two of the slickest confidence men" committed reversible error); *State v. Tucker*, 190 N.C. 708, 709, 130 S.E. 720, 720 (1925) (holding that it was prejudicial error for a prosecutor to say that the defendants "look[ed] like . . . (professional) bootleggers"); *State v. Davis*, 45 N.C. App. 113, 114-15, 262 S.E.2d 329, 329-30 (1980) (holding that it was prejudicial for a prosecutor to call the defendant a "mean S.O.B."). As a result, we hold that the trial court abused its discretion when it allowed, over defendant's objection, the prosecutor's closing argument linking the tragedies of Columbine and Oklahoma City with the tragedy of the victim's death in this case.

**[6]** Defendant also contends that he was prejudiced by the trial court's failure to intervene and stop the prosecutor from infecting closing arguments with improper name-calling and/or personal insults. Again, we must agree.

The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. *State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999). In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

In applying the aforementioned standard to the facts of the case at bar, we initially note the following: an examination of the transcript reveals that the prosecutor engaged in name-calling during his closing argument; for example, he said to the jury, "You got this quitter, this loser, this worthless piece of—who's mean. . . . He's as mean as they come. He's lower than the dirt on a snake's belly." As previously noted, in order to constitute reversible error, the prosecutor's remarks must be both improper and prejudicial. Improper remarks are those calculated to lead the jury astray. Such comments include references to matters outside the record and statements of personal opinion. *See* part I, *supra*. Improper remarks may be prejudicial either because of their individual stigma or because of the general tenor of the argument as a whole. Here, the prosecutor's charac-

terizations exceed the boundaries of proper argument by incorporating personal conclusions that ultimately amounted to little more than name-calling. What the prosecutor did not do here was argue the evidence and proper inferences and conclusions that addressed the specific issues submitted as to aggravating and mitigating circumstances. Such tactics risk prejudicing a defendant—and do so here—by improperly leading the jury to base its decision not on the evidence relating to the issues submitted, but on misleading characterizations, crafted by counsel, that are intended to undermine reason in favor of visceral appeal.

Moreover, we note that the prosecutor's comment deriding defendant as "lower than the dirt on a snake's belly" is substantively similar to the prosecutor's comments in *Smith*, 279 N.C. at 165, 181 S.E.2d at 459 (prosecutor, amid numerous improper characterizations in closing argument, referred to the defendant as one who was "lower than the bone belly of a cur dog"). The Court in *Smith* ultimately concluded that the prosecutor's comments were prejudicial error and ordered a new trial. *Id.* at 167, 181 S.E.2d at 460-61. Similarly, in the case at bar, we hold that the prosecutor's repeated degradations of defendant: (1) shifted the focus from the jury's opinion of defendant's character and acts to the prosecutor's opinion, offered as fact in the form of conclusory name-calling, of defendant's character and acts; and (2) were purposely intended to deflect the jury away from its proper role as a fact-finder by appealing to its members' passions and/or prejudices. As a consequence, we deem the disparaging remarks grossly improper and prejudicial.

III.

[7] We should note at this point that in determining prejudice in a capital case, such as the one before us, special attention must be focused on the particular stage of the trial. Improper argument at the guilt-innocence phase, while warranting condemnation and potential sanction by the trial court, may not be prejudicial where the evidence of defendant's guilt is virtually uncontested. However, at the sentencing proceeding, a similar argument may in many instances prove prejudicial by its tendency to influence the jury's decision to recommend life imprisonment or death. We also point out that by its very nature, the sentencing proceeding of a capital case involves evidence specifically geared towards the defendant's character, past behavior, and personal qualities. Therefore, it is certainly appropriate for closing argument at the sentencing hearing to incorporate reasonable inferences and conclusions about the defendant that are drawn from the

**STATE v. JONES**

[355 N.C. 117 (2002)]

evidence presented. However, mere conclusory arguments that are not reasonable—such as name-calling—or that are premised on matters outside the record—such as comparing defendant's crime to infamous acts—do not qualify and thus cannot be countenanced by this or any other court in the state. "If verdicts cannot be carried without appealing to prejudice or resorting to unwanted denunciation, they ought not to be carried at all." *Tucker,* 190 N.C. at 714, 130 S.E. at 723.

Finally, this Court has tried to strike a balance between giving appropriate latitude to attorneys to argue heated cases and the need to enforce the proper boundaries of closing argument and maintain professionalism. The power and effectiveness of a closing argument is a vital part of the adversarial process that forms the basis of our justice system. A well-reasoned, well-articulated closing argument can be a critical part of winning a case. However, such argument, no matter how effective, must: (1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial. Moreover, professional decorum requires that tactics such as name-calling and showmanship must defer to a higher standard. While the melodrama inherent to closing argument might well inspire some attorneys to favor stage theatrics over reasoned persuasion, such preference cannot be countenanced—as either a general proposition or on the facts of the case *sub judice.* As a result, we conclude that the trial court abused its discretion by affording the prosecution undue latitude in its closing arguments at sentencing. Defendant is, therefore, entitled to a new sentencing hearing.

NO ERROR AS TO GUILT-INNOCENCE.

DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.