Justice EARLS concurring in part and dissenting in part.
I agree with the majority's holding that "the indictment in this case was sufficient to vest the trial court with subject matter jurisdiction to try defendant for attempted first-degree murder." Nonetheless, a new trial is warranted because the prosecutor's statements to the jury in this case are similar to statements this Court has previously held to be improper and to constitute prejudicial error necessitating a new trial, even when not objected to at trial. In addition, the trial judge should have intervened ex mero motu during the prosecutor's closing argument when the prosecutor urged the jury to convict Jermaine Antwan Tart based not on whether Mr. Tart had the requisite mental intent at the time of the offense but rather out of fear that as a "homicidal, manipulative, sociopath" who "had the specific intent to kill many people, over a 20-year period of time," he would be "unleashed, yet again, onto our streets" to kill innocent people. Thus, I would reverse the decision of the Court of Appeals and remand for a new trial.
The prosecutor's closing argument was improper in two significant respects, each one independently sufficient to justify a new trial. Together they assuredly dictate that result. The first impropriety was the prosecutor's inflammatory name-calling and fear mongering, including calling defendant "a homicidal sociopath" four times during the closing argument. The second impropriety was the prosecutor's reliance on events that all the evidence showed never happened as "factual" motivations supposedly leading defendant to decide to kill Mr. Cassidy. Take away these parts of the prosecution's closing argument and all that is left is the prosecutor's appropriate description of the attack itself, summary of defendant's actions immediately after the attack, and discussion of the jury instructions. The improprieties that occurred were not mere throwaway lines in a long and proper argument; they were the heart of the prosecutor's presentation to the jury. The nature of the improper statements "rendered the proceedings fundamentally unfair."
*846 State v. Mann , 355 N.C. 294, 308, 560 S.E.2d 776, 785 (citation omitted), cert. denied , 537 U.S. 1005, 123 S.Ct. 495, 154 L.Ed.2d 403 (2002).
**87 1. Standard of Review
Two different standards apply when reviewing cases involving improper closing arguments, depending on whether there was an objection at trial. If the defendant made a timely objection, the question is "whether the trial court abused its discretion by failing to sustain the objection." State v. Jones , 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). The standard of review for improper closing arguments when, as in this case, the defendant fails to object is "whether the argument complained of was so grossly improper that the trial court erred in failing to intervene ex mero motu ." State v. Trull , 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), cert. denied , 528 U.S. 835, 120 S.Ct. 95, 145 L.Ed.2d 80 (1999).
This Court has explained that "[w]hen the prosecutor becomes abusive, injects his personal views and opinions into the argument before the jury, he violates the rules of fair debate and it becomes the duty of the trial judge to intervene to stop improper argument and to instruct the jury not to consider it." State v. Smith , 279 N.C. 163, 166, 181 S.E.2d 458, 460 (1971). In Smith the Court concluded that "[i]n these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence." Id. at 166, 181 S.E.2d at 460 (quoting Berger v. United States , 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) ). In reviewing statements made during closing arguments, this Court does not examine the statements in isolation but rather "give[s] consideration to the context in which the remarks were made and the overall factual circumstances to which they referred." State v. Dalton , 369 N.C. 311, 316, 794 S.E.2d 485, 489 (2016) (quoting State v. Ward , 354 N.C. 231, 265, 555 S.E.2d 251, 273 (2001) ). "Improper remarks may be prejudicial either because of their individual stigma or because of the general tenor of the argument as a whole." Jones , 355 N.C. at 133, 558 S.E.2d at 108.
2. Improper Name-Calling and Appeals to Prejudice
There can be no doubt that in this case the only issue the jury needed to determine was whether Mr. Tart had the requisite mental capacity to intend to kill Mr. Cassidy. There was no dispute over whether Tart was the person who attacked Cassidy; Tart agreed that there should not be a self-defense instruction, and both the prosecution and the defense argued to the jury in closing that the only question for them was Mr. Tart's state of mind at the time of the attack. The only issue for the jury was whether defendant was delusional and unable to form the intent to kill, as the defense contended: "This whole case turns on the capacity of Mr. Tart's mind, around 8 o'clock at night at First Presbyterian Church in downtown Winston-Salem on March 2nd, 2014. Was he capable of **88 forming the specific intent to kill Mr. Cassidy? ... [W]as his mind all there enough for him to be able to?" Or was he intending to kill Mr. Cassidy with premeditation, as the prosecution argued: "The intent, his intent to kill Richard Cassidy is written all over this case. It is written in blood. His intent to kill Richard Cassidy is a stain on the sidewalk in front of First Presbyterian Church." Additionally, the court instructed the jury on the issue of lack of mental capacity as it related to both the attempted first-degree murder charge and the charge of assault with a deadly weapon with intent to kill inflicting serious injury.[1]
In these circumstances, the prosecutor's repeated statements that Tart is a "violent, manipulative, homicidal sociopath" were not intended to shed light on whether he was indeed delusional at the time of the attack but rather to make the point that defendant needed to be incarcerated so he would not harm anyone else. The prosecutor's statements "were purposely intended to deflect the jury away from its proper role as a fact-finder by appealing to its members' passions and/or prejudices," causing the remarks to be prejudicial and grossly improper. Jones , 355 N.C. at 134, 558 S.E.2d at 108. The *847 prosecutor hammered home this theme by referencing the testimony of Dr. Herfkens who, it must be said, had examined Tart and concluded that "at the time of the crime, Jermaine was acting under the influence of a severe mental illness that did not allow him to properly understand reality and the significance of his alleged actions." Nevertheless, the prosecutor used that evidence to make this argument to the jury:
But what she did consider is the Defendant's mental health history, a 20-year mental health history.
Members of jury [sic], that is ripe with examples of violence, and homicidal ideations, the desire and intent to kill other people. The mental illness, if he did in fact suffer one, it didn't prevent him from forming the specific intent to kill. He had the specific intent to kill many people, over a 20-year period of time. That mental illness continued to come back up through all of these diagnoses, through all of these hospitalizations.
**89 Antisocial Personality Disorder, a disorder characterized by violence. By deceit. By manipulation. By an inability to conform your conduct to the confines of the law. ... You know what a synonym is for someone who suffers from Antisocial Personality Disorder ? A sociopath.
So the Defendant is a violent, manipulative, homicidal sociopath. That's his diagnosis. Based on that. They want you to just give him a slap on the wrist for this. Because he's been diagnosed as a homicidal sociopath, we'll let you do this.
....
... You can protect our communities and ensure that a homicidal, manipulative, sociopath, is not unleashed, yet again, onto our streets.
The prosecutor set up this argument to use the pejorative term "sociopath" by referencing and asking about the term in his cross-examination of Dr. Herfkens, and in his questioning of Dr. Blanks when called by the State to rebut the testimony of Dr. Herfkens, and he persisted in using the word even though both experts testified that the term is no longer used by medical professionals.
Notably, the prosecutor used a tactic similar to one that this Court found improper in State v. Dalton , 369 N.C. at 314, 320, 794 S.E.2d at 488, 491, in which the prosecutor attempted to dissuade the jury from finding the defendant not guilty by reason of insanity because such a verdict could result in the defendant "be[ing] back home in less than two months." (Emphasis omitted.) In Dalton , the evidence presented at trial concerning the defendant's severe mental illness did not support the prosecutor's assertions that the defendant would "very possibl[y]" be released in fifty days. Id. at 318, 794 S.E.2d at 490. Nevertheless, as in Dalton , the statement here that "[y]ou can protect our communities and ensure that a homicidal, manipulative, sociopath, is not unleashed, yet again, onto our streets" is also prejudicial because the remark was not directed at the issue the jury needed to decide under the law but rather was intended to create the fear of future harm. See, e.g. , id. at 319, 794 S.E.2d at 490 (Regarding defendants with mental health issues, prosecutors must remember that "[t]he level of possibility or probability of release is not the salient issue; rather, it is the evidence and all reasonable inferences that can be drawn from that evidence which govern counsel's arguments in closing."). Just as with the insanity defense at issue in Dalton , the diminished capacity defense requires the defendant's **90 own attorney to provide evidence of the defendant's mental illness. See, e.g. , id. at 320, 794 S.E.2d at 491 (Jackson, J., concurring) ("Because the defendant has the burden of proving the affirmative defense of insanity, even the defendant's own attorney may provide evidence that the defendant's mental illness caused him or her to engage in conduct that a jury might find shocking or reprehensible." (citing State v. Wetmore , 298 N.C. 743, 746-47, 259 S.E.2d 870, 873 (1979) )). Here there is considerable evidence that Mr. Tart was incapable of knowing right from wrong at the time of the crime: for example, his assertions that Mr. Cassidy had killed him in 1989 and more recently arranged for others to kill him again, and his statements to police right after the incident that he heard Mr. Cassidy say he was going to have Mr. Tart killed and that Cassidy had shot him in the head when he was eight years old. *848 Thus, as in Dalton , "a juror who believes the evidence of [diminished capacity] might nevertheless be motivated to find the defendant guilty based on fear for the safety of the community." Id. at 322, 794 S.E.2d at 492 (citing State v. Hammonds , 290 N.C. 1, 224 S.E.2d 595 (1976) ).
The prosecutor's rhetoric in his closing argument likely sparked fear in the minds of the jurors that defendant was like a wild animal who, if "unleashed ... onto [the] streets," would again try to kill someone. "This Court does not condone comparisons between defendants and animals." State v. Roache , 358 N.C. 243, 297, 595 S.E.2d 381, 416 (2004). The prosecutor's use of language more identified with an animal, such as "unleashed," dehumanized defendant and was only heightened by the prosecutor's repeated, derogatory name-calling that characterized defendant as a homicidal sociopath. Using this theme of fear, the prosecutor "improperly [led] the jury to base its decision not on the evidence relating to the issues submitted, but on misleading characterizations, crafted by counsel, that [were] intended to undermine reason in favor of visceral appeal." Id. at 297-98, 595 S.E.2d at 416 (first alteration in original) (quoting Jones , 355 N.C. at 134, 558 S.E.2d at 108 ). Rather than mere "hyperbole," these statements were improper and highly prejudicial in the circumstances of this case.
The prosecutor's further assertion that defendant had the specific intent to kill many people over a twenty-year period was drawn in part from an expert witness's report that defendant had murderous ideations that could be defined as an intent. The prosecutor then took this information and manipulated it to suggest to the jury that defendant had been roaming the streets looking for someone to kill and would do so again. As this Court observed in State v. Miller , 271 N.C. 646, 657, 157 S.E.2d 335, 344 (1967), "[d]efendants in criminal prosecutions should be **91 convicted upon the evidence in the case, and not upon prejudice created by abuse administered by the solicitor in his argument."
This Court has previously found less derogatory statements about a defendant to be plain error justifying a new trial, even when the defendant did not object at trial. In describing the defendant in Smith , the prosecutor stated he was "lower than the bone belly of a cur dog." 279 N.C. at 165, 181 S.E.2d at 459. This Court granted the defendant a new trial and noted that by failing to intervene in the prosecutor's argument, the trial judge "was derelict in his duty." Id. at 167, 181 S.E.2d at 461. In State v. Matthews , 358 N.C. 102, 111, 591 S.E.2d 535, 542 (2004), this Court concluded that counsel engaged in improper name-calling by referring to the defendant's theory of the case as "bull crap." (Emphasis omitted.)
In Jones the prosecutor in his closing argument compared the Columbine school shootings and the Oklahoma City bombing with the defendant's crime, which this Court noted was "a thinly veiled attempt to appeal to the jury's emotions." 355 N.C. at 132, 558 S.E.2d at 107. The Court held the closing arguments to be improper and prejudicial, and vacated the defendant's death sentence because the trial judge failed to intervene. Id. at 132-35, 558 S.E.2d at 107-09. Indeed, the Court there noted: "[T]his Court is mindful of the reluctance of counsel to interrupt his adversary and object during the course of closing argument for fear of incurring jury disfavor." Id. at 129, 558 S.E.2d at 105 ; see also State v. Moss , 180 W. Va. 363, 368, 376 S.E.2d 569, 574 (1988) (finding that a prosecutor's statements that a defendant was a "psychopath" and needed to be convicted of first-degree murder so that he would "never be released to slaughter women and children" in the community were plain error and denied the defendant his fundamental right to a fair trial).
The statements made by the State in its closing argument here were grossly improper and required the trial court to intervene ex mero motu . This Court has long established that a defendant has a "right to a fair and impartial trial .... where passion and prejudice and facts not in evidence may have no part." State v. Smith , 240 N.C. 631, 636, 83 S.E.2d 656, 659 (1954). It is within the court's power and "is the duty of the judge to interfere when the remarks of counsel are not warranted by the evidence, and are calculated to mislead or prejudice the jury."
*849 Id. at 635, 83 S.E.2d at 659 (citations omitted). The purpose of this protection is "to safeguard the rights of litigants and to be as nearly sure as possible that each party shall stand before the jury on equal terms with his adversary, and not be hampered in the prosecution or defense of his cause, by extraneous considerations, which militate against a fair hearing." Id. at 635, 83 S.E.2d at 659 (quoting **92 Starr v. S. Cotton Oil Co. , 165 N.C. 587, 595, 81 S.E. 776, 779 (1914) ). It is imperative that the prosecutor remember "that the State's interest 'in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " Matthews , 358 N.C. at 112, 591 S.E.2d at 542 (quoting Berger , 295 U.S. at 88, 55 S.Ct. 629 ).
3. Referring to Delusions as Fact
The second impropriety in the prosecutor's argument occurred when he suggested that delusional thoughts and statements about things that never happened could have rationally led Jermaine Tart to form the requisite specific intent to kill Mr. Cassidy. At two different times in his closing argument, the prosecutor referred to events that Cassidy testified did not happen, and he urged the jury to find that those events explained why Tart's attack on Cassidy was rationally motivated by a premeditated intent to kill untouched by diminished mental capacity. The prosecutor referred to each of these things that never happened as a "factual, non-delusion reason, or motivation for doing what he did." It is improper for counsel to make arguments that are not based on reasonable inferences that may be drawn from the evidence admitted at trial. See State v. Anderson , 322 N.C. 22, 37, 366 S.E.2d 459, 468 (1988).
There is simply no support for the proposition that events that never happened, such as Cassidy stealing Tart's medicine, which Cassidy testified never occurred, or Cassidy not giving Tart his telephone number, which again, Cassidy testified never happened, could appropriately be called "factual" and "non-delusional." Wholly imagined events cannot support a reasonable inference that defendant acted rationally. The mere fact that Mr. Tart tragically chose to act on his delusions is not proof of specific intent. See Roache , 358 N.C. at 282, 595 S.E.2d at 407. Thus, the prosecutor improperly implied that events that never occurred could be "factual" and could therefore explain a rational intent to kill.
The majority dismisses this argument by pointing out that the trial court found defendant to be competent to stand trial. This is completely beside the point. The issue is whether, at the time of this assault, Mr. Tart was suffering from a mental illness such that he lacked the mental capacity to form the requisite intent to kill with premeditation. Even the prosecution admits that defendant's mental state on the night of 2 March 2014 is what is at issue in this case. That defendant subsequently received treatment, took medications, and ultimately was found competent to stand trial answers a completely different question than whether he suffered from a diminished mental capacity on the night of this incident. For the prosecutor to argue that things which never **93 happened could be "factual" and could explain Tart's actions was an improper inference from the evidence presented at the trial of this case.
"In sum, improper closing arguments cannot be tolerated." Matthews , 358 N.C. at 112, 591 S.E.2d at 542. For all these reasons, and taking into account all the improper statements made here, I must respectfully dissent from the portion of the majority opinion that concludes the trial court did not abuse its discretion in declining to intervene ex mero motu during the State's closing argument. The trial court should have stopped the prosecutor's use of improper and prejudicial statements in closing argument that were designed to inflame the jury's fears, direct its attention away from the issue to be decided, and cause jurors to infer facts contrary to those in evidence. A new, fair trial is warranted.

For example, with regard to the attempted murder charge, the jury was instructed, "If, as a result of lack of mental capacity, the Defendant did not have the specific intent to kill Mr. Cassidy, formed after premeditation and deliberation, the Defendant is not guilty of Attempted First Degree Murder."