STATE OF NORTH CAROLINA v. KENIS RAY JOHNSON

No. COA10-1410

(Filed 16 August 2011)

**1. Drugs—trafficking—sale of opium derivative—sale of schedule III substance—not mutually exclusive**

Judgments against defendant for both trafficking in opium and the possession and sale of a schedule III substance were not mutually exclusive. The trafficking statute refers to the total weight of the opium derivative at issue rather than the quantitative measure per dosage unit.

**2. Evidence—video—replayed during closing and deliberations**

A narcotics trafficking defendant did not meet his burden of showing that the trial court abused its discretion by determining that the versions of a video recording played during closing argument and during jury deliberations constituted the same evidence that had been admitted during the State's case-in-chief. The video was enlarged and shown in slow motion during the closing argument and frame-by-frame during deliberations.

**3. Constitutional Law—effective assistance of counsel—necessity of prejudice**

Defense counsel was not ineffective during a narcotics trafficking prosecution where defense counsel did not object to characterizations of an informant as reliable. Defendant did not show prejudice from the alleged errors.

Appeal by Defendant from judgments entered 23 July 2010 by Judge Benjamin G. Alford in Superior Court, Onslow County. Heard in the Court of Appeals 12 April 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Charles G. Whitehead, for the State.*

*Kevin P. Bradley for Defendant.*

McGEE, Judge.

Kenis Ray Johnson (Defendant) was found guilty on 23 July 2010 of: selling and delivering, and possession with the intent to sell and deliver a schedule III controlled substance; trafficking in opium by transporting, selling, and delivering more than 28 grams of an opium derivative; maintaining a vehicle for the purpose of selling controlled substances; and possession of drug paraphernalia. Defendant was found not guilty of child abuse. The trial court sentenced Defendant to a prison term of 225 to 279 months on 23 July 2010, and ordered Defendant to pay a fine of $500,000.00 for trafficking in opium by delivering more than 28 grams of an opium derivative. The trial court also sentenced Defendant to a consecutive prison term of 225 to 279 months, and ordered Defendant to pay an additional fine of $500,000.00 for trafficking in opium by transporting and selling more than 28 grams of an opium derivative, and for selling and possession with intent to sell and deliver a schedule III controlled substance. The trial court arrested judgment on Defendant's guilty verdict for delivery of a schedule III controlled substance. Defendant appeals.

Defendant was arrested in a "buy-bust sting operation" conducted by the Onslow County Sheriff's Office. An informant, Joshua Burgess (Mr. Burgess), called Detective Vishaud Samlall (Detective Samlall) of the Onslow County Sheriff's Office on 17 July 2009 to inform Detective Samlall that he could set up a deal the following day to buy Vicodin pills from Defendant. Detective Samlall authorized the deal and the following morning, he met with Mr. Burgess and several officers of the Onslow County Sheriff's Office, including Sergeant Robert Ides (Sergeant Ides). In preparation for the operation, the officers searched Mr. Burgess and his vehicle; the searches revealed no drugs or money. The officers then equipped Mr. Burgess with a "button camera[,]" a small camera made to look like a button and worn in place of a button on a person's clothing. Mr. Burgess was to use the button camera to record audio and video of the anticipated drug purchase. The officers also issued $350.00 of "buy money" to Mr. Burgess to purchase 180 Vicodin pills from Defendant. Detective Samlall had previously photocopied the $350.00 to make it identifiable.

The officers and Mr. Burgess drove to a grocery store parking lot in Swansboro, North Carolina, the site of the anticipated drug purchase. Mr. Burgess met Defendant in the grocery store parking lot and interacted with him for about a minute. Although several officers observed the interaction, no officers observed Mr. Burgess and Defendant exchange any money or drugs. Mr. Burgess testified that

he purchased a bottle of pills from Defendant for $350.00, signaled to the officers that the deal was complete, and then drove away. After the officers observed Mr. Burgess signal that the deal was complete, the officers converged on Defendant's vehicle and arrested Defendant. Defendant's seven-year-old son was also in Defendant's vehicle. Detective Samlall testified that he searched Defendant's vehicle and found the $350.00 that had been issued to Mr. Burgess. Sergeant Ides testified that he followed Mr. Burgess and stopped him a short distance away from the parking lot. Sergeant Ides searched Mr. Burgess and his vehicle, locating a pill bottle containing 169.5 pills, but no additional drugs and no money. Sergeant Ides took possession of the pill bottle and the button camera worn by Mr. Burgess during the interaction.

Melanie Thornton (Ms. Thornton), a forensic chemist with the N.C. State Bureau of Investigation (SBI), testified that she analyzed and identified the pills "as a mixture of acetaminophen and Hydrocodone." Ms. Thornton also testified that the pills constituted "a Schedule III preparation of an opiate derivative, dihydrocodeinone, with a total weight of 118 grams." It is apparent from the record, and the parties agree, that Hydrocodone and dihydrocodeinone are synonymous.

Defendant testified that he received "180 pills every 30 days" for pain caused by his diabetes. During Defendant's cross-examination, the State asked Defendant if he got "Vicodin or dihydrocodeinone from the VA" and Defendant responded "[t]hat is correct." Defendant testified that he and Mr. Burgess attended a cookout on 17 July 2009, where Mr. Burgess, aware of the pain Defendant's diabetes caused Defendant, offered to give Defendant several Percocet pills the following day. Defendant testified that he met Mr. Burgess in a grocery store parking lot on 18 July 2009, and that Mr. Burgess approached Defendant's vehicle and dropped an empty pill bottle into Defendant's lap, which Defendant immediately gave back to Mr. Burgess. Defendant denied ever selling any pills to Mr. Burgess and denied that the $350.00 "buy money" was ever in his possession or in his vehicle.

A DVD copy of the audio and video recording made by the button camera worn by Mr. Burgess (the recording) was admitted into evidence and published to the jury at trial. During closing arguments, the trial court allowed the State to republish the recording and the trial court made the following remarks:

> The republication of [the recording] was done in a manner differently from the way it was presented to the jury during the [S]tate's case in chief. That difference was that it was presented

in a frame-by-frame manner and, at times, he had enlarged it. It was done, ostensibly, because, at regular speed, it was unable to be seen—certain items, such as the money and the pill bottle in that—in that video.

At the jury's request, the recording was again republished, in a frame-by-frame manner, during jury deliberations. Further facts will be introduced in the opinion as necessary.

I.

[1] Defendant's first argument is that the trial court erred in entering judgments for both trafficking in opium and for selling and possession with intent to sell and deliver a schedule III controlled substance because the judgments "are mutually exclusive for the same conduct." We disagree.

"Verdicts are mutually exclusive when a verdict 'purports to establish that the [defendant] is guilty of two separate and distinct criminal offenses, the nature of which is such that guilt of one necessarily excludes guilt of the other.'" *State v. Mumford*, 364 N.C. 394, 400, 699 S.E.2d 911, 915 (2010) (citation omitted). For example, our Supreme Court concluded in *State v. Speckman*, 326 N.C. 576, 578, 391 S.E.2d 165, 167 (1990) (citation omitted), that "a defendant may not be convicted of both embezzlement and false pretenses arising from the same act or transaction, due to the mutually exclusive nature of those offenses[.]" The *Speckman* Court explained:

This Court has held that to constitute embezzlement, the property in question initially must be acquired lawfully, pursuant to a trust relationship, and then wrongfully converted. On the other hand, to constitute false pretenses the property must be acquired unlawfully at the outset, pursuant to a false representation. This Court has previously held that, since property cannot be obtained simultaneously pursuant to both lawful and unlawful means, guilt of either embezzlement or false pretenses necessarily excludes guilt of the other.

*Id.* at 578, 391 S.E.2d at 166-67 (citations omitted).

In the present case, Defendant specifically argues:

Read together, the [relevant] statutes evince a legislative intent that sale, delivery, and possession with intent to sell or deliver therapeutic amounts of prescription pain pills containing the opium derivative dihydrocodeinone be punished as Class H or

Class I felonies under Schedule III, and not as the synonymous opium derivative hydrocodone under Schedule II subject to elevated punishment under the trafficking provisions.

. . . .

Schedule III includes "controlled substances . . . [with] currently accepted medical use in the United States", N.C.G.S. §90-91, and the quantitative inclusion in Schedule III of "recognized therapeutic amounts" of specified mixtures containing dihydrocodeinone shows legislative intent to except such amounts of such medicines from trafficking penalties through the "except as otherwise provided in this Article" clause of N.C.G.S. §90-95(h)—while the same opium derivative is otherwise subject to ordinary and trafficking penalties as Schedule II hydrocodone, N.C.G.S. §90-90(1)(a)(10).

The trial court entered judgments against Defendant for trafficking in opium. In relevant part, N.C. Gen. Stat. § 90-95(h)(4) (2009) provides:

(h) Notwithstanding any other provision of law, the following provisions apply except as otherwise provided in this Article.

. . . .

(4) Any person who sells, manufactures, delivers, transports, or possesses four grams or more of opium or . . . derivative, or preparation of opium . . . shall be guilty of a felony which felony shall be known as "trafficking in opium or heroin" and if the quantity of such controlled substance or mixture involved:

. . . .

c. Is 28 grams or more, such person shall be punished as a Class C felon and shall be sentenced to a minimum term of 225 months and a maximum term of 279 months in the State's prison and shall be fined not less than five hundred thousand dollars ($500,000).

The trial court also entered judgment against Defendant for selling and possession with intent to sell and deliver a schedule III preparation of an opium derivative. In relevant part, N.C. Gen. Stat. § 90-95(a)-(b) (2009) provides:

(a) Except as authorized by this Article, it is unlawful for any person:

(1) To manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance;

. . . .

(b) Except as provided in subsections (h) and (i) of this section, any person who violates G.S. 90-95(a)(1) with respect to:

. . . .

(2) A controlled substance classified in Schedule III . . . shall be punished as a Class I felon, except that the sale of a controlled substance classified in Schedule III . . . shall be punished as a Class H felon.

We find no support for Defendant's argument that a schedule III preparation of an opium derivative does not qualify as a "derivative . . . or preparation of opium" for the purposes of the trafficking statute, N.C.G.S. § 90-95(h)(4). Schedule III preparations of the opium derivative dihydrocodeinone are differentiated from schedule II preparations of the same opium derivative by the quantitative ratio of dihydrocodeinone to nonnarcotic ingredients *per dosage unit. See* N.C. Gen. Stat. § 90-91(d)(3)-(5) (providing descriptions of schedule III preparations of dihydrocodeinone); N.C. Gen. Stat. § 90-90(1)(a)-(b) (providing description of schedule II controlled substances including "any . . . derivative . . . or preparation of opium"). In contrast, the quantitative requirements of the trafficking statute refer to the total weight of the opium derivative at issue, and *not* the quantitative measure of the opium derivative per dosage unit. *See* N.C.G.S. § 90-95(h)(4) (referring to "[a]ny person who sells, manufactures, delivers, transports, or possesses four grams or more of opium or . . . derivative, or preparation of opium"). Accordingly, the "except as otherwise provided in this Article" clause of N.C.G.S. § 90-95(h) does not impact that statute's applicability to schedule III controlled substances.

Defendant makes no additional arguments regarding his assertion that the judgments for trafficking in opium and for selling and possession with intent to sell and deliver a schedule III controlled substance are mutually exclusive for the same conduct. Defendant's argument is without merit.

## II.

[2] Defendant's second argument is that the trial court "erred in allowing the [State], over objection, to display an enhanced version of a video recording during closing argument and during jury delibera-

tion, which enhanced version had not been offered into evidence[.]" We disagree.

"During a closing argument to the jury an attorney may not . . . make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice." N.C. Gen. Stat. § 15A-1230 (2009). *See also State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002) ("references to events and circumstances outside the evidence" constitute improper closing arguments). During jury deliberations, the trial court may, in its discretion, "permit the jury to reexamine in open court . . . materials admitted into evidence." N.C. Gen. Stat. § 15A-1233(a) (2009). We review appeals regarding improper closing arguments and appeals regarding the reexamination of evidence during jury deliberations for an abuse of discretion by the trial court. *See Jones*, 355 N.C. at 131, 558 S.E.2d at 106; *State v. McVay*, 174 N.C. App. 335, 340, 620 S.E.2d 883, 886 (2005). "A court's complete failure to exercise discretion amounts to reversible error." *McVay*, 174 N.C. App. at 340, 620 S.E.2d at 886 (citations omitted). Where a trial court has exercised its discretion, we find an abuse of discretion only " 'where the [trial] court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* (citation omitted).

In the present case, Defendant argues that the trial court erred by permitting the State to republish the recording both during closing argument and during jury deliberation because the two republications of the recording constituted "new evidence." Regarding the republication of the recording during closing argument, the trial court made the following statement:

> The republication of [the recording] was done in a manner differently from the way it was presented to the jury during the [S]tate's case in chief. That difference was that it was presented in a frame-by-frame manner and, at times, he had enlarged it. It was done, ostensibly, because, at regular speed, it was unable to be seen—certain items, such as the money and the pill bottle in that—in that video. The court, in its discretion—[defense counsel] objected timely, at the time that it was being done. The court overruled that objection.

Regarding the same republication of the recording during closing argument, Defendant specifically objected

> to the [S]tate's closing argument and the fact that they used the video in a way that was not presented as evidence to the jury; and

that way was, they slowed it down and first did a still-by-still, picture-by-picture frame, and then they slowed it down and did it in slow motion, in an enhanced version.

The trial court "agree[d] that they did that" but nevertheless overruled Defendant's objection.

Before the recording was republished during jury deliberations, the trial court overruled Defendant's renewed objection to the republication of the recording, stating: "Well, because *the court believes that it's the same evidence that was being offered,* albeit in a slowed down manner, because the court also believes that a lawsuit is a search for the truth, the court is going to overrule the objection and permit it." (Emphasis added). The State accordingly republished the recording, and the following exchange between defense counsel and the trial court occurred.

[DEFENSE COUNSEL]: I just want to make comments about the video. Frame by frame, there was no money shown, so I don't know what he did during his closing to actually show that money, and I'm trying to figure that out now, because this is frame by frame, and I didn't see any money.

THE COURT: I did.

[DEFENSE COUNSEL]: You saw the money?

THE COURT: I saw the money.

[PROSECUTOR]: I can go back to that section, if you like.

THE COURT: If you would. Go back[.]

. . . .

[PROSECUTOR]: I'm starting at [the relevant time], and I'll tap through it.

(THE ABOVE-REFERRED-TO PORTION OF [THE RECORDING] WAS PLAYED.)

THE COURT: Stop right there. All right.

[DEFENSE COUNSEL]: Thank you, Your Honor.

The foregoing excerpts from the record make clear that the trial court exercised discretion when overruling Defendant's objections to the two republications of the recording. Moreover, Defendant has not met his burden of demonstrating that the trial court abused its dis-

cretion when it determined that the versions of the recording displayed during closing argument and during jury deliberations constituted the same evidence that had previously been admitted during the State's case-in-chief. The record reveals that there were two differences between the original display of the recording and the displays during closing argument and jury deliberations: during closing argument and during jury deliberations, the recording "was presented in a frame-by-frame manner." During closing argument, the video recording was "enlarged" and shown in "slow motion, in an enhanced version." We note, initially, that we consider the displays of the recording in "slow motion" and in a "frame-by-frame manner" to be essentially equivalent, and we will refer to both, collectively, as the display of the recording in a frame-by-frame manner.

Regarding the display of the recording in a frame-by-frame manner, we find useful the analysis in *State v. Brewington*, 343 N.C. 448, 471 S.E.2d 398 (1996). In *Brewington*, the trial court admitted an incriminating videotape into evidence for substantive purposes without objection from the defendant. *Id.* at 455, 471 S.E.2d at 402. Later, the defendant objected when the State moved to publish the videotape to the jury in slow motion; the trial court overruled the objection. *Id.* On appeal, our Supreme Court stated, "[i]n light of the probative value of this videotape, we conclude the trial court did not abuse its discretion in permitting the jury to view the videotape in real time or in slow motion." *Id.* at 456, 471 S.E.2d at 403.

In the present case, the trial court concluded that the display of the recording in a frame-by-frame manner constituted the same evidence which had already been admitted during the State's case-in-chief. Although *Brewington* is not dispositive on the precise issue before this Court, the *Brewington* Court's analysis lends further support to the trial court's determination that the display of the recording in a frame-by-frame manner did not constitute "new evidence." Notably, the decisive factor in *Brewington*, the probative value of the slow motion display of the videotape recording, *id.*, is also present in the case before us. Defendant repeatedly denied that the $350.00 "buy money" was ever in his vehicle. The record reveals that the display of the video in a frame-by-frame manner may have showed "the money" during the interaction between Mr. Burgess and Defendant. The display of the recording in a frame-by-frame manner, like the slow motion display of the videotape in *Brewington*, was therefore particularly probative. In any event, we are unable to conclude that the trial court's determination on this matter was " 'manifestly unsupported

by reason or [wa]s so arbitrary that it could not have been the result of a reasoned decision.' " *McVay*, 174 N.C. App. at 340, 620 S.E.2d at 886 (citation omitted). The trial court did not abuse its discretion in determining that the republication of the recording in a frame-by-frame manner did not constitute new evidence.

The record further reveals, however, that during closing argument the recording was additionally displayed in an "enlarged" or otherwise "enhanced version." As the above excerpts highlight, there is confusion in the record as to the exact nature of this additional "enhance[ment.]" The trial court stated that the State had "at times . . . enlarged" the display of the recording. The trial court also agreed that the recording was displayed "in slow motion, in an enhanced version." It is unclear, however, what exactly constituted this additional "enhance[ment.]" Accordingly, the record has not been sufficiently preserved for us to make a determination that any additional "enhance[ment]" of the recording was such that the display of the recording in such a manner constituted new evidence. We conclude that the trial court did not abuse its discretion in overruling Defendant's objections to the display of the recording during closing argument and during jury deliberation. Defendant's argument is without merit.

### III.

[3] Defendant's third argument is that Defendant's trial "counsel failed to function as the 'counsel for defense' guaranteed by Article I, Section 23, of the Constitution of North Carolina and by the Sixth and Fourteenth Amendments to the Constitution of the United States[.]" We disagree.

The "test for ineffective assistance of counsel is the same under both the state and federal constitutions." *State v. Thompson*, 359 N.C. 77, 115, 604 S.E.2d 850, 876 (2004) (citation omitted).

> When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness. In order to meet this burden [a] defendant must satisfy a two part test.
>
> > First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prej-

udiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable.*

*State v. Braswell,* 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985) (citations omitted).

In the present case, Defendant argues that he received ineffective assistance of counsel at trial for two reasons. First, Defendant argues that his trial counsel "neglect[ed] to object to and join[ed] in repeated characterizations of the police informant as a 'confidential and reliable informant' or 'CRI[.]'" Defendant reasons that because no "police officer witnessed an exchange of money for pills[,]" the "question for the jury was whether to believe the testimony of [Mr.] Burgess asserting or the testimony of [Defendant] denying such exchange." Defendant concludes that to "determine whether the State met its burden of proof, the jury had to decide whether or not [Mr.] Burgess was reliable." We disagree.

Assuming, *arguendo,* that Defendant has presented a situation where defense counsel " 'made errors so serious that counsel was not functioning as the "counsel" guaranteed' " by the federal and state constitutions, *id.* at 562, 324 S.E.2d at 248 (citation omitted), Defendant has failed to show prejudice from the alleged errors. Defendant's argument presumes that the State could not meet its burden of proof without proving that Mr. Burgess was a more credible witness than Defendant. However, Defendant's argument fails to take account of the fact that the jury also viewed a recording of the interaction between Defendant and Mr. Burgess. As stated by the trial court, that recording featured "certain items, such as the money and the pill bottle[,]" which, alongside the testimony of State's witnesses other than Mr. Burgess, would have allowed the State to meet its burden of proof regarding Defendant's guilt. Accordingly, Defendant has failed to show that these alleged errors " 'were so serious as to deprive . . . [D]efendant of a fair trial[.]' " *Id.* (citation omitted).

Defendant also argues that he received ineffective assistance of counsel because his trial counsel failed to object to "hearsay and non-expert opinion" that characterized Mr. Burgess as a prescription medication addict who was not a potential threat to other people but characterized Defendant as a drug dealer who posed a greater threat to other people. We note that, as stated by Defendant, there was no objection to the alleged "hearsay and non-expert opinion" testimony at trial. Defendant does not argue that the testimony at issue fails the

plain error standard. Accordingly, we make no determination as to whether the admission into evidence of the testimony at issue was in error.

Assuming, *arguendo*, that defense counsel's failure to object to the "hearsay and non-expert opinion" testimony at issue presents a situation where defense counsel " 'made errors so serious that counsel was not functioning as the "counsel" guaranteed' " by the federal and state constitutions, *id.* at 562, 324 S.E.2d at 248 (citation omitted), Defendant has failed to show prejudice from the alleged error. In his brief, Defendant argues why defense counsel should have objected to the testimony at issue, under the applicable evidentiary rule, and then simply asserts: "Trial counsel's failure to object prejudiced fair determination whether to believe [Mr.] Burgess'[] testimony or [Defendant's] testimony." Like Defendant's first argument regarding ineffective assistance, this argument fails to take into account the probative value of the recording which depicted the interaction between Mr. Burgess and Defendant. We also note that, despite Defendant's arguments that his trial counsel's alleged errors bolstered Mr. Burgess' credibility with the jury, Defendant's trial counsel repeatedly attacked Mr. Burgess' credibility throughout the trial. Because the State could meet its burden of proof regardless of the credibility of Mr. Burgess' testimony, Defendant has failed to show prejudice in this matter. Defendant's argument is without merit.

No error.

Judges STROUD and BEASLEY concur.