IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-64

No. 119PA20

Filed 11 June 2021

STATE OF NORTH CAROLINA

v.

BRANDON ALAN PARKER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 269 N.C. App. 629, 839 S.E.2d 83 (2020), finding no error in a judgment entered on 12 June 2018 by Judge Ebern T. Watson III in Superior Court, Sampson County.  Heard in the Supreme Court on 26 April 2021.

*Joshua H. Stein, Attorney General, by Michael T. Wood, Special Deputy Attorney General, for the State-appellee.*

*Michael E. Casterline for defendant-appellant.*

BERGER, Justice.

¶ 1     On June 11, 2018, a Sampson County jury found defendant Brandon Alan Parker guilty of possession of a firearm by a felon.  After the jury returned its verdict, defendant pleaded guilty to attaining habitual felon status.  Defendant appealed, and on February 4, 2020, a unanimous panel of the Court of Appeals found no error in defendant's conviction, concluding that the prosecutor's statements during closing argument were not grossly improper.  Defendant petitioned this Court for discretionary review.

## I.    Factual and Procedural Background

On March 5, 2015, Michael Harbin, Carlos James, Derrick Copeland, and an unidentified male went to Garland, North Carolina, to purchase marijuana from Jafa McKoy.  Harbin drove a Toyota Camry with James and Copeland inside, while the unidentified male followed them in a Ford Explorer.

The men arrived in Garland between 10:00 and 10:30 a.m.  The unidentified driver of the Ford Explorer parked at a nearby apartment complex and remained there while Harbin, James, and Copeland drove to a house at a different location. When Harbin, James, and Copeland arrived, two men were standing outside. Copeland recognized McKoy standing near the front porch, and McKoy introduced the other man, who was on the porch, as "P."  Copeland described "P" as being about six feet and two inches tall, weighing around 240 pounds, and having "a Muslim-type beard, brown skin, [and] tattoo on the upper cheek."  Harbin stated that the man on the porch was wearing a red hat, and was "[l]ike a bigger, burley (*sic*) dude."

Upon arrival, McKoy informed the men that the marijuana was not there. Harbin, James, and Copeland then left the house and drove to a nearby gas station to buy cigarettes.  The three men left the gas station around 11:13 a.m. and returned to the house.

When they returned, McKoy and "P" were outside of the house and a compact car, that was not previously present, was parked outside.  Copeland and Harbin

exited the Camry while James remained inside. McKoy told Copeland that the marijuana was in the compact car. As Copeland and Harbin walked toward the car, "P" jumped off the porch, pulled out a revolver, and moved toward the Camry. At the same time, McKoy pulled out a gun and began firing at Copeland and Harbin. Copeland and Harbin escaped to the woods, and they made their way to the Ford Explorer parked at the nearby apartment complex. Copeland, Harbin, and the unidentified male traveled back to the house to look for James. After failing to locate James, Harbin called 911 around 12:24 p.m.

¶ 6        Around 12:30 p.m., Freddie Stokes, a resident of the house, returned home and saw a body in his driveway. Stokes called 911, and Sampson County EMS subsequently arrived at the house to find James dead in the driveway. James died from a single gunshot wound to the head.

¶ 7        On March 9, 2015, defendant was identified by Copeland from a photographic lineup as the man McKoy introduced as "P." Copeland stated that he had eighty-five to ninety percent confidence in his identification of defendant.

¶ 8        Thirteen days after the homicide, on March 18, 2015, defendant learned that law enforcement was looking for him, and defendant called the police and went to the sheriff's office. The same day, Agent William Brady with the North Carolina State Bureau of Investigation interviewed defendant. Initially, defendant denied being present at the house where James was killed. However, approximately seventeen

minutes into the interview, defendant admitted he was at the house that morning but claimed that he left by 8:30 or 9:00 a.m. The same day that defendant was interviewed by Agent Brady, the State obtained a search warrant for defendant's cell phone records, including defendant's cell site data.

¶ 9 At trial, Copeland and Harbin testified for the State. During their testimony, neither Copeland nor Harbin positively identified defendant in the courtroom as the man they knew as "P." The State also presented testimony from Jane Peterson, who was dating defendant in March 2015. Peterson testified about defendant's appearance and stated that in March 2015, defendant had a close-cut beard and tattoos on his arm and face. During Peterson's testimony, the State introduced, for illustrative purposes, a photograph of defendant's upper torso that showed defendant had a tattoo on his chest. Defendant objected to the introduction of the photograph.

¶ 10 The trial court, in ruling on the admissibility of the photograph, stated the following:

> In this case, you have someone who has testified she was in a close relationship on the date in question. She's also testified that she has a memory of his physical appearance at the time. She's testified that over your suggestion that it was a peace sign, that his right hand appears to be raised in example of a peace sign, as a layperson might interpret that one way or another. And there's nothing ominous about a peace sign, of course. That's her layperson interpretation and her opinion of the sign that was given by the person in the photograph using their right hand.

The individual in the photograph is bare from the waist up, appearing to have a white, baseball-type cap placed on his head and his right hand raised in some type of gesture. It does not show him in the company of any other individuals. It does not show him in a menacing or compromising position. It does show tattoos that she has now said she believes were the same, not different, than what she has testified about in her earlier recollections.

The hat, itself, appears to be white in color, to have a brim, and then have some established marking on it that might represent a sports affiliate, the New York Yankees, of some sort. But it is a neutral color, white. And it is not very graphic as to what the tattoos might say or appear to be, but it does appear to show ink markings upon the chest and/or upper torso of the subject in the photograph itself. Those are not immutable characteristics. Those are things that have been placed upon an individual by choice.

Tattoos are things that you mark yourself with by choice. Those are not things you are born with. And if you place them on your person, you do so in a way that permanently identifies you right, wrong, or indifferent. You subject yourself to that. And, in this case, any of those markings were placed there without any rebuttal at this time, not forcibly, but upon request of the individual that displayed them so proudly in the photograph, and that's not substantially prejudicial, in my opinion. It is admissible for illustrative purposes.

¶ 11    In addition, the State tendered Special Agent Michael Sutton with the Federal Bureau of Investigation as an expert witness on historical cell site analysis and cellular technology. Agent Sutton testified that defendant's phone was used on March 5, 2015, from approximately 8:09 a.m. to 9:57 a.m. in an area of Garland that included the house in question. Between 9:57 a.m. and no later than 11:38 a.m., defendant's

phone could not be identified because it was not in use. At 11:49 a.m., defendant's phone was determined to be located in Clinton, North Carolina.

¶ 12    During closing arguments, the prosecutor made the following three statements without objection that mentioned defendant having a chest tattoo:

> And they gave you a description of a guy, Muslim-type beard, big, burley (*sic*), larger than Jafa. They knew Jafa. They could tell the difference between this guy and Jafa. A tattoo on his chest, the same guy who was seen on the porch, pulling the revolver from his waistband. The same type of weapon that killed the victim.
>
> . . . .
>
> . . . The man that Michael Harbin described as a big, burley (*sic*) guy with a beard and a hat pulled low who gets up, pulls out a revolver, and walks towards Carlos. The man on the porch that Derrick Copeland described as 6'2, big with a beard, called P, with a tattoo on his chest, who got up, and pulled out a revolver, and went towards Carlos in the car. That's what Mr. Copeland said.
>
> . . . .
>
>      Ms. Peterson told you what the defendant looked like back on March 5, 2015. He looks a little different today. But she told you that back in March of 2015 he looked like this big, burley (*sic*) guy with a beard, even a low hat and a tattoo on his chest, just like Mr. Copeland told you.

¶ 13    Prior to closing arguments, the trial court instructed the jury as follows:

> The final arguments of the lawyers are not evidence but are given to assist you in evaluating the evidence. . . .
>
> . . . .
>
> . . . Now if, in the course of making a final argument, a

> lawyer attempts to restate a portion of the evidence and
> your recollection of the evidence differs from that of the
> lawyer, you are as jurors in recalling and remembering the
> evidence, to be guided exclusively by your own recollection
> of the said evidence.

¶ 14        During the jury charge after closing arguments, the trial court similarly

instructed the jury as follows:

> Now, members of the jury, you have heard the
> evidence and the arguments of counsel. If your recollection
> of the evidence differs from that of the attorneys, you are
> to rely solely upon your recollection. Your duty is to
> remember the evidence, whether called to your attention or
> not.

¶ 15        Defendant was found guilty of possession of a firearm by a felon and not guilty

of the remaining charges.    Defendant subsequently pleaded guilty to attaining

habitual felon status, and he was sentenced to a minimum of 105 months to a

maximum of 138 months in prison.   Defendant entered notice of appeal.

¶ 16        In a published opinion filed February 4, 2020, the Court of Appeals determined

that the State's closing argument did not constitute prejudicial error and that

defendant failed to show that trial court erred in not intervening *ex mero motu*. *State*

*v. Parker*, 269 N.C. App. 629, 639, 839 S.E.2d 83, 90 (2020).  Defendant filed a petition

for discretionary review, which this Court allowed on June 3, 2020.

## II.    Analysis

¶ 17        "Arguments of counsel are largely in the control and discretion of the trial

court.  The appellate courts ordinarily will not review the exercise of that discretion

unless the impropriety of counsel's remarks is extreme and is clearly calculated to

prejudice the jury." *State v. Huffstetler*, 312 N.C. 92, 111, 322 S.E.2d 110, 122 (1984).

"When defendant does not object to comments made by the prosecutor during closing

arguments, only an extreme impropriety . . . will compel this Court to hold that the

trial judge abused his discretion in not recognizing and correcting *ex mero motu* an

argument that defense counsel apparently did not believe was prejudicial when

originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693

(1996).

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted).

A "[g]rossly improper argument is defined as conduct so extreme that it renders

a trial fundamentally unfair and denies the defendant due process." *State v. Fair*,

354 N.C. 131, 153, 557 S.E.2d 500, 517 (2001). A "trial court is not required to

intervene *ex mero motu* unless the argument strays so far from the bounds of

propriety as to impede defendant's right to a fair trial." *State v. Smith*, 351 N.C. 251, 269, 524 S.E.2d 28, 41 (2000) (quoting *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998)).

¶ 19        Defendant contends that the three statements referencing defendant's chest tattoo were not supported by the evidence, and as a result, the trial court committed reversible error when it failed to intervene *ex mero motu*. In essence, defendant argues that in the absence of intervention by the trial court *ex mero motu*, misstatements of evidence by an attorney during closing arguments entitles the opposing party to a new trial. We decline to impose a perfection requirement on the attorneys and trial courts of this State, ever mindful that parties are "entitled to a fair trial but not a perfect one." *State v. Branch*, 288 N.C. 514, 536, 220 S.E.2d 495, 510 (1975) (quoting *Lutwak v. United States*, 344 U.S. 604, 619 (1953)), *overruled on other grounds by State v. Adcock*, 310 N.C. 1, 310 S.E.2d 587 (1984).

¶ 20        Here, rather than stating that the individual on the porch identified as "P" had a tattoo on his face, the prosecutor stated that the tattoo was on his chest. At trial, Copeland, Harbin, and Peterson all testified to defendant's appearance. While there was evidence admitted that showed defendant had a chest tattoo, neither Copeland nor Harbin identified "P" as having a chest tattoo. Copeland described the man on the porch as being about six feet and two inches tall, weighing around 240 pounds, and having "a Muslim-type beard, brown skin, [and] tattoo on the upper cheek."

Harbin stated that the man on the porch was wearing a red hat pulled low and had a bigger, burly build. According to Harbin, this was the individual that pulled out a revolver, jumped off the porch, and walked towards the Camry.

Defendant admitted to being at the house the morning of March 5, 2015, and defendant's cell site data placed his phone in the vicinity of the house on the morning of the shooting and traveling away from the location in the hours following the incident. Two witnesses placed an individual matching defendant's appearance at the scene. Those characteristics were confirmed by Peterson as matching defendant's appearance in March 2015.

This Court has found that "improper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others." *Jones*, 355 N.C. at 131, 558 S.E.2d at 106.

> [I]n cases of clear-cut violations—those couched as appeals to a jury's passions or that otherwise resulted in prejudice to a defendant—this Court has not hesitated to overturn the results of the trial court. *State v. Smith*, 279 N.C. 163, 165–67, 181 S.E.2d 458, 459–60 (1971) (reversing defendant's rape conviction because of the prosecutor's "inflammatory and prejudicial" closing argument, in which the prosecutor described defendant as "lower than the bone belly of a cur dog"); *see also State v. Miller*, 271 N.C. 646, 659–61, 157 S.E.2d 335, 344–47 (1967) (holding that the prosecutor committed reversible error by, *inter alia*, calling defendants "storebreakers" and expressing his opinion that a witness was lying).

*Id.* at 129, 558 S.E.2d at 105; *see also State v. Ward*, 354 N.C. 231, 266, 555 S.E.2d 251, 273 (2001) (holding that the trial court erred in not intervening *ex mero motu* when the prosecutor impermissibly commented on the defendant's right to remain silent during sentencing by stating, "he decided just to sit quietly. He didn't want to say anything that would 'incriminate himself' ").

¶ 23        The statements in this case stand in stark contrast to remarks this Court has previously held to be grossly improper.  This is not the case where an attorney engages in name-calling, makes statements of opinion, intrudes upon constitutional rights, or references events outside of the evidence.  *See Jones*, 355 N.C. at 131, 558 S.E.2d at 106.  This is a case where an attorney mistakenly summarized evidence during her closing argument.  Nothing in the record suggests that the prosecutor's misstatements about the location of the tattoo were intentional, much less "clearly calculated to prejudice the jury." *Huffstetler*, 312 N.C. at 111, 322 S.E.2d at 122.  We fail to see how the conflation of the location of defendant's tattoos in conjunction with the other evidence of defendant's appearance at trial was an extreme or gross impropriety. *See Fair*, 354 N.C. at 153, 557 S.E.2d at 517.

¶ 24        Defendant further contends that statements and arguments by attorneys to the jury may be afforded greater weight and that the danger of unfair prejudice

results from even unintentional misstatements of the evidence.[1] However, the plain language of the trial court's instructions to the jury acknowledges and contemplates that attorneys may mistakenly summarize the evidence during closing arguments.

The jurors were specifically instructed that they were to "be guided exclusively by [their] own recollection" of the evidence any time their "recollection of the evidence differs from that of the attorneys." The jury heard the instructions immediately before and after closing arguments. "Jurors are presumed to follow the instructions given to them by the court." *State v. Price*, 344 N.C. 583, 593, 476 S.E.2d 317, 323 (1996) (quoting *State v. Johnson*, 341 N.C. 104, 115, 459 S.E.2d 246, 252 (1995)). There is no evidence in the record from which we can conclude that the jurors failed to follow the trial court's instructions concerning the manner in which they should consider closing arguments by counsel.

Moreover, defendant's argument would permit attorneys to sit back in silence during closing arguments but then claim error whenever a trial court fails to address or otherwise correct a misstatement of the evidence. *See generally State v. Tart*, 372 N.C. 73, 81, 824 S.E.2d 837, 842–43 (2019) ("In circumstances in which a defendant in his or her role as an obvious interested party in a criminal trial fails to object to the other party's closing statement at trial, yet assigns as error the detached trial

---

[1] The opposite may well be true. Jurors may be distrustful of attorneys who repeatedly misstate the evidence, thus, compromising the prospect of a successful outcome.

judge's routine [silence] during closing arguments in the absence of any objection, this Court has consistently viewed the appealing party's burden to show prejudice and reversible error as a heavy one."). Trials are not carefully scripted productions. Absent extreme or gross impropriety in an argument, a judge should not be thrust into the role of an advocate based on a perceived misstatement regarding an evidentiary fact when counsel is silent.

The misstatements by the prosecutor appear to be mistakes in arguing the evidence admitted at trial for which defendant did not lodge an objection, and defendant has failed to meet his heavy burden. Based on the circumstances presented in this case, the misstatements by the prosecutor during closing arguments were not extreme or grossly improper, and the trial court did not abuse its discretion when it declined to intervene *ex mero motu*. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.