IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-563

Filed 5 March 2024

Gaston County, Nos. 21 CRS 54366, 22 CRS 2164

STATE OF NORTH CAROLINA

v.

NEVIN JAY LINDSAY

Appeal by defendant from judgment entered 20 February 2023 by Judge David A. Phillips in Superior Court, Gaston County. Heard in the Court of Appeals 7 February 2024.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Amanda J. Reeder, for the State.*

*Sean P. Vitrano, for defendant-appellant.*

ARROWOOD, Judge.

Nevin Jay Lindsay ("defendant") appeals from judgment entered upon his conviction for second degree forcible sexual offense, sexual battery, and assault on a female. For the following reasons, we affirm the judgment.

I.     Background

Defendant waived his right to a jury trial on 5 January 2023, and the case came on for bench trial on 23 January 2023. The evidence offered at trial tended to show the following facts:

In April 2021, Zara[1] was an eighteen-year-old senior in high school living with her mother and two younger brothers in an apartment. During the latter part of the month, defendant—a close friend of Zara's family—was staying at the apartment while visiting from New York.

On 26 April, defendant picked Zara up from school and drove her back to the apartment. At 7:26 p.m., while Zara's mother was taking a nap in her room, defendant texted Zara that he was "rolling up in the car" to smoke marijuana with Zara. Zara responded via multiple texts, stating:

>   **Zara**: Okay
>
>   **Zara**: Coming give me sex[2]
>
>   **Zara**: Sec [laughing emoji]

Defendant and Zara smoked marijuana on the front porch around 8:00 p.m.[3] At 8:59 p.m., defendant texted Zara, "Wow ok[,]" and then at 10:28 p.m., he texted her, "Cum get this[.]"[4]

Zara's mother left for work around 9:50 p.m. At approximately 11:00 p.m., while Zara was cleaning the kitchen and her brothers were watching television in

---

[1] Zara is a pseudonym used to keep the individual's name anonymous in the interest of privacy.

[2] Zara testified that she meant to type "sec"—i.e., that she was coming to meet defendant in a second—but the phone auto-corrected to "sex." Zara immediately corrected the error by sending the message, "Sec."

[3] Zara testified that defendant also drank alcohol that evening but that she did not.

[4] Zara testified that defendant's 8:59 p.m. text "was in response to [her earlier] sex/sec [text,]" and his 10:28 p.m. text was in reference to the marijuana he was going outside to smoke. Zara did not go outside to smoke with him on this subsequent occasion.

their mother's room, defendant went into Zara's bedroom and laid down in her bed. When Zara went to her bedroom around midnight, she discovered defendant sleeping in her bed.[5] Zara testified that she tried getting defendant up so he could move to the living room, but "he was just knocked out cold[,] [s]o I just left him there." Zara placed blankets on her bedroom floor and went to sleep there.

Zara's recollection of what happened next was detailed during direct testimony at trial:

> **Zara**: I remember me getting ready to just doze off. And I definitely felt like a discomfort feeling, so I eventually woke up. And when I woke up I didn't see anybody on the bed, so it made me startled where I seen [defendant], like, at the bottom of me, under my blanket.
>
> **The State**: I'm going to stop you there just a second, okay, Zara? When you said you felt something, I think you used the word uncomfortable ---
>
> **Zara**: Yes.
>
> **The State**: --- what did you feel?
>
> **Zara**: I felt, like, moisture. Like I felt somebody doing something to my private area.
>
> **The State**: Did you feel something inside your private area, like moving around?
>
> **Zara**: No, ma'am.
>
> **The State**: Okay. When you say you felt moisture in your

---

[5] Zara testified that when defendant previously stayed with them, he normally slept on the couch in the living room, and Zara always slept in her bedroom.

3

private area, was it in your vaginal area?

**Zara**: Yes.

**The State**: Was it between the labia, or the lips of your vaginal area?

**Zara**: Yeah.

**The State**: What were you wearing at the time?

**Zara**: Leggings.

**The State**: Where were your leggings at that point, when you felt that?

**Zara**: It was, like, under, like, my butt cheeks, like, my bottom.

**The State**: Did you have underwear on?

**Zara**: No. Just because my bottoms felt like – they fitted me like sweatpants, you know, like baggy. So, no, I didn't.

**The State**: Baggy leggings?

**Zara**: Yeah.

**The State**: Were you – when you woke up, and you felt this on your vaginal area, were you laying on your stomach or on your side or on your back? How were you laying?

**Zara**: On my stomach.

**The State**: Where was the blanket?

**Zara**: At that point my blanket was, like, more on my back.

4

**The State**: You've described what you felt. Describe what you saw. Were you able to, like, look up?

**Zara**: Yeah, once I turned around.

**The State**: What do you mean, turned around, like, look behind you?

**Zara**: Yes.

**The State**: What did you see?

**Zara**: I seen him on all fours.

**The State**: Who did you see on all fours?

**Zara**: [Defendant].

**The State**: What did you do?

**Zara**: I stood there in shock. And I asked him what he was doing.

**The State**: When you say you stood there, were you actually standing, or how were you positioned?

**Zara**: I was still laying on my back. I'm sorry, my stomach. But, you know, for me turning around, like, I was just turned (indicating).

**The State**: Okay. And you said to him, what are you doing?

**Zara**: Yes.

**The State**: What did he say?

**Zara**: Oh, I'm sorry, I'm sorry, I'm sorry.

**The State**: What happened next?

5

> **Zara**: I said, you better get the fuck out. I got up. I ran to the bathroom, I washed myself.

After leaving the bathroom, Zara went straight to her mother's room and locked the door.[6] At that point, defendant had left Zara's bedroom and was in the living room. Zara testified that defendant then came to her mother's door asking Zara to come out and talk to him. According to Zara, defendant sounded scared and was slurring his words. At 2:24 a.m., defendant texted Zara the following messages:

> **Defendant**: You really not coming to talk to me

> **Defendant**: Ok if you feel that way come lock the door

Defendant left the apartment shortly after sending these texts. Zara did not go back to sleep the rest of the night.

In the morning, Zara spoke with her cousin and told her what happened between her and defendant. Specifically, Zara's cousin testified that Zara told her, "I was sleeping and I just felt really moist, so when I woke up I seen [defendant's] head between my legs." Zara's cousin further testified that while Zara was on the phone with her, Zara was "crying, bawling" and "in shock."

Around 6:15 a.m., Zara's mother returned home from work. At some point that day, Zara asked to speak with her mother in Zara's bedroom. Then, while on the

---

[6] While in her mother's room, Zara testified that she attempted to contact her older cousin and best friend, but they did not respond until the following day.

6

phone with her cousin[7], Zara explained to her mother what defendant did. Zara's mother testified that Zara told her that "she ended up waking up to [defendant] between her legs while she was on her stomach" and that defendant's "face was in between . . . her buttocks, basically."

Zara's mother immediately confronted defendant via video call. Zara's mother testified that, while on the call, defendant denied putting his "mouth on her" but admitted to "bit[ing Zara] on her lower back." Later, defendant sent Zara's mother a text message stating, "First how the hell I get her naked while she sleeping? Second I never licked her I bit her just above lower back she woke, and I told her to take her bed n I'll stay on the floor the next thing I know she jumped in the shower."

Zara's mother also called the police, and Officer Alexis Snyder ("Officer Snyder") from Gastonia Police Department met with Zara and her mother at the apartment. Officer Snyder spoke with Zara's mother first. At trial, Officer Snyder testified[8] that Zara's mother informed her that defendant sexually assaulted Zara; specifically, Zara's mother stated that "her daughter told her that this uncle/friend had used his tongue on her vagina[.]" When interviewing Zara, Officer Snyder

---

[7] Zara testified that she wanted her cousin on the phone with her while talking to her mother because Zara was afraid of "how her response was just going to be" since defendant "was somebody that we really, like, took in as family."

[8] The State called Officer Snyder as a witness for the purpose of corroborating the in-court testimony of Zara and Zara's mother. Additionally, before Officer Snyder testified, the State sought permission from the trial court and defense counsel to call Officer Snyder to the stand prior to Zara's mother testifying because Officer Snyder was in nursing school at the time and needed to "get back to her other school duties." The trial court subsequently permitted it.

testified that Zara told her that while "[s]he was sleeping, . . . she awoke to [defendant] in between her legs, licking her vagina." Defendant did not object to either of these statements by Officer Snyder.

While in Zara's bedroom, Officer Snyder "observe[d] the blankets and the pillows on the floor[.]" Officer Snyder advised Zara not to get a sexual assault kit examination because a supervisor had told her that "due to the time frame" and that Zara had showered, it was not recommended. Officer Snyder also collected Zara's leggings as evidence.

Zara and her mother later agreed to recorded interviews with Detective Heather Houser ("Detective Houser") of the Gastonia Police Department. Without objection, portions of the 29 April 2021 interviews were admitted as evidence at trial. During Zara's interview, Zara told Detective Houser that "[defendant] definitely didn't penetrate me. I definitely felt moisture, which was definitely his mouth area, so he was using his tongue. . . . All I felt really were like licks." During the interview with Zara's mother, Zara's mother stated that "[Zara] was sleeping on the floor . . . and when she was awakened, [defendant] was in between her legs with his face, his mouth, down on her, licking her vagina."

Detective Houser tried reaching defendant by phone but never received a call back. Pursuant to search warrant, Detective Houser collected a buccal DNA swab

from defendant on 6 July 2021.[9]  Detective Houser further testified that Zara's leggings were tested for DNA because, according to Zara, she had put them on "after the incident[.]"[10]

At the close of the State's evidence, defendant moved to dismiss the charges on the basis that the elements had not been met, but the motion was denied.  After declining to testify or present evidence, defendant moved again to dismiss the charges, and the motion was denied.

During closing arguments, the State, in relevant part, stated:

> [Zara] has no reason to lie about this.  She loved this man as her uncle.  He was brought into the home.  You heard about the earlier events that day.  Absolutely no argument, no animosity, nothing going on for her to make this up.  She has nothing against him.  She loved him.  The defendant wants you to believe, or is pretty much asking you to believe that she made this up.  Why would she make this up and put herself and her family through all of this?  An entire investigation, talking to not one police officer but then two more detectives, and then actually having to come in and testify in a courtroom.  She wouldn't do that unless she was telling the truth, and she is, and she did.
>
> In a sexual assault case like this, especially when you are – when it involves a person that is trusted and known to the victim, you have to look at the credibility of the victim, and of the witnesses in the case.  You have to look at consistency and corroboration.  Your Honor knows that if you believe this victim in this case then you believe this case beyond a reasonable doubt.   And that's why

---

[9] When Detective Houser attempted to obtain defendant's DNA, defendant stated that he was not going to comply without his attorney present.  Detective Houser (and other officers) then used force to obtain defendant's saliva sample.

[10] At trial, the State did not submit the results of any DNA testing.

consistency and corroboration are important.

[Zara], on this particular date, back in April of 2021, in the middle of the night she texted her cousin [ ]. The next morning is when she finally had the opportunity to speak to [her cousin]. She told [her] what [defendant] had done to her. She then told her mother. She talked to Patrol Officer . . . Snyder. She talked to detectives. And then she testified under oath. And throughout all of it she was consistent. She did not embellish, she didn't change the facts, because she was telling the truth.

And what did she gain from this? She gained nothing but embarrassment. She told this courtroom, including the defendant, had to face him, and other strangers in here, what she had experienced. She benefited in no way at all by coming forward in this case. In fact, this was embarrassing for her. But the defendant still is denying it and saying this was all made up. You could hear, and you could see in her testimony how hard this was for her to talk about. She would stop, she would breathe, at one point she had to blow her nose. Visibly upset.

You heard from . . . her cousin, her big sis, and her mother, that as [Zara] told them what the defendant did to her she cried, he was upset. And then, even in the video interview that you saw of the victim, [Zara], visibly on two separate occasions got upset. [Zara] is not an Academy Award-winning actress, she's a victim, and she was traumatized, and she has no reason to lie about this.

Don't allow that defendant to benefit from assaulting her at a time when there were no witnesses around, when he had the opportunity to be alone with her. The defense is almost saying, like, this is some big conspiracy theory. Like, she decided to wake up in the middle of the night and say, hey, I'm going to claim that he did this to me, text [her cousin], lock herself in a bathroom, go to the bedroom, tell two relatives the next day, go to police. For what? It's not just something she thought up to do. She's telling the truth.

The judge found defendant guilty of second-degree forcible sexual offense, assault on a female, and sexual battery. The court consolidated the three offenses into the second-degree forcible sexual offense and sentenced defendant to a minimum of 100 month and a maximum of 180 months in the North Carolina Department of Adult Corrections. The court also ordered that, upon his release from imprisonment, defendant register as a sex offender for thirty years. Defendant gave notice of appeal in open court.

## II.    Discussion

On appeal, defendant contends that the trial court committed plain error when it admitted Officer Snyder's testimony regarding out-of-court statements as well as statements from the recorded interview. Defendant also contends that the trial court erred by failing to intervene *ex mero motu* during the State's closing argument. We take each argument in turn.

### A.    Out of Court Statements

Defendant contends that the out-of-court statements at issue are inadmissible hearsay evidence because (1) none of the statements corroborated in-court testimony and (2) the hearsay exception for excited utterances was inapplicable to the recorded statements. We disagree.

When an issue is not preserved by objection at trial, appellate courts review the issue for plain error. *State v. Caballero*, 383 N.C. 464, 473 (2022) (citing N.C.R.

App. P. 10(a)(4) (2023)). Plain error concerns error that "seriously affects the fairness, integrity, or public reputation of judicial proceedings" and should "be applied cautiously and only in the exceptional case." *State v. Odom*, 307 N.C. 655, 660 (1983) (cleaned up). Proving plain error requires that the defendant show that the error at trial was fundamental—i.e., the error had a probable impact on the jury's finding that the defendant was guilty. *State v. Lawrence*, 365 N.C. 506, 518 (2012) (citation omitted).

However, "in a bench trial, we presume the trial court ignored any inadmissible evidence unless the defendant can show otherwise." *State v. Jones*, 260 N.C. App. 104, 109 (2018) (citation omitted). In other words, we give the trial court the benefit of the doubt that it adhered to basic rules and procedure when sitting without a jury. *Id.* Therefore, "no prejudice exists simply by virtue of the fact that such evidence was made known to [the trial judge] absent a showing by the defendant of facts tending to rebut this presumption." *State v. Jones*, 248 N.C. App. 418, 424 (2016).

" 'Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness.' " *State v. Harrison*, 328 N.C. 678, 682 (1991) (quoting *State v. Rogers*, 299 N.C. 597, 601 (1980)). A prior statement may be used to corroborate a witness's in-court testimony even if the witness has not been impeached. *State v. Harris*, 253 N.C. App. 322, 332 (2017) (citation omitted); *see also State v. Walters*, 357 N.C. 68, 88 (2003) (concluding that both a 911 tape and the witness's out-of-court statement to a detective were admissible to corroborate the

12

witness's earlier in-court testimony). Prior statements admitted for corroborative purposes are not hearsay because they are not offered for the truth of the matter asserted. *State v. Thompson*, 250 N.C. App. 158, 163 (2016) (citations omitted). Consequently, such statements do not implicate the confrontation clause and are not to be admitted as substantive evidence. *Id.* (citations omitted).

To be admissible as corroborative evidence, "prior consistent statements merely must tend to add weight or credibility to the witness's testimony. Further, it is well established that such corroborative evidence may contain new or additional facts when it tends to strengthen and add credibility to the testimony which it corroborates." *State v. Farmer*, 333 N.C. 172, 192 (1993) (citations omitted); *see also Thompson*, 250 N.C. App. at 165 ("[T]he mere fact that a corroborative statement contains additional facts not included in the statement that is being corroborated does not render the corroborative statement inadmissible[.]"); *State v. Barrett*, 228 N.C. App. 655, 664 (2013) (concluding the prior statements were admissible as corroborative evidence despite having minor inconsistencies with the trial testimony); *State v. Martin*, 309 N.C. 465, 476 (1983) ("If the previous statements are generally consistent with the witness' testimony, slight variations will not render the statements inadmissible, but such variations only affect the credibility of the statement." (citing *State v. Britt*, 291 N.C. 528 (1977)).

Here, defendant contends that neither Zara nor her mother testified that

defendant performed cunnilingus[11] on Zara. Additionally, because the out-of-court statements were that defendant "licked [Zara's] vagina"—i.e., performed cunnilingus on her—defendant contends the statements contradicted the testimony. We disagree as the out-of-court statements at issue were corroborative and not substantially different from the in-court testimony. Specifically, when asked if the moisture she felt was in her "vaginal area[,]" Zara testified, "Yes." Moreover, when asked if the moisture feeling was "between the labia, or the lips of [her] vaginal area[,]" Zara testified, "Yeah." Similarly, Zara's mother testified that Zara had explained to her that she woke "up to [defendant] between her legs while she was on her stomach" and that defendant's "face was in between . . . her buttocks[.]"

Both the out-of-court statements and in-court testimony thus tended to show that defendant pulled Zara's pants down, manipulated her body, and pressed his tongue against her vagina while she was sleeping—i.e., defendant engaged in a sexual act by force and against Zara's will. N.C.G.S. § 14-27.27(a)(1) (2023); *see also* § 14-27.20(4) (including cunnilingus as an example of a "sexual act"). Further, any differences between the out-of-court statements and the in-court testimony do not constitute substantial variance, let alone contradictory information. Accordingly, the out-of-court statements at issue are not hearsay and were admissible for

---

[11] As defendant points out in his brief, our Supreme Court considers cunnilingus to be "the slightest touching by the lips or tongue of another to any part of the woman's genitalia." *State v. Ludlum*, 303 N.C. 666, 674 (1981).

corroboration purposes.[12]

However, even assuming arguendo that the trial court should not have admitted the statements, defendant failed to show that the trial judge did not ignore the statements in making their decision and that the statements were prejudicial. Accordingly, "[w]e do not make assumptions of error where none is shown." *Jones*, 260 N.C. App. at 110 (citation omitted).

In view of the fact that bench trials in North Carolina are a relatively new occurrence and rarely used, *see* N.C. Const. art. I, § 24 (permitting criminal defendants to waive their right to a jury trial in certain cases and request a bench trial as of 2014), there do not appear to be cases that have determined whether a plain error analysis is on point given the longstanding authority that a judge is presumed to have ignored any incompetent evidence. Thus, it does not seem that one can establish plain error in a bench trial despite defendant contending that such error occurred here. Rather, as discussed above, the standard in a bench trial is distinct from plain error review and requires that defendant introduce facts showing the trial judge, in fact, considered inadmissible evidence.

## B.    State's Closing Argument

Defendant contends that the trial court erred by failing to intervene *ex mero motu* during the State's closing argument. Specifically, defendant contends that the

---

[12] Because the out-of-court statements were admissible as corroborative evidence, we do not need to address whether the recorded statements constitute excited utterances.

15

State's "repeated statements that [Zara] was telling the truth constituted improper vouching and violated" N.C.G.S. § 15A-1230(a).  We disagree.

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*."  *State v. Jones*, 355 N.C. 117, 133 (2002) (citation omitted).  The standard thus requires determining (1) whether the argument was improper, and if so, (2) whether it "was so grossly improper as to impede the defendant's right to a fair trial."  *State v. Huey*, 370 N.C. 174, 179 (2017) (citations omitted).

Section 15A-1230 of the North Carolina General Statutes states that during closing arguments, attorneys may not "express [their] personal belief[s] as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant . . . ."  N.C.G.S. § 15A-1230(a).  Yet, attorneys "are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence."  *State v. Richardson*, 342 N.C. 772, 792–93, *cert. denied*, 519 U.S. 890 (1996).

Here, the statements at issue—e.g., that Zara "ha[d] no reason to lie about this"—were merely inferences reasonably drawn from the evidence, which defense counsel details in its closing.  However, even assuming arguendo that some of the State's closing arguments included impermissible statements of opinion, none of it was so "grossly improper" as to have required the trial court to intervene *ex mero*

*motu.* *Jones*, 355 N.C. at 133; *see also State v. Brown*, 320 N.C. 179, 206 (1987) ("Although the prosecutor may have strained the rational connection between evidence and inference, he did not strain it so far as to require *ex mero motu* intervention by the trial court . . . .").

Further, because it is presumed that trial judges "ignore inadmissible evidence when they serve as the finder of fact in a bench trial," it follows that such judges also presumably ignore any personal beliefs of counsel that were included in their closing arguments. *Jones*, 248 N.C. App. at 424. Thus, like in *Jones*, the trial judge presumably disregarded any personal beliefs purportedly inserted into the State's closing argument that pertained to whether Zara was telling the truth. Accordingly, the trial court did not err by failing to intervene *ex mero motu* during the State's closing argument.

## III. Conclusion

For the foregoing reasons, we affirm the trial court's judgment.

AFFIRMED.

Judge HAMPSON concurs.

Judge MURPHY dissents in part and concurs in result only.

MURPHY, Judge, dissenting in part and concurring in result only.

The Majority makes a sweeping expression in dicta that "it does not seem that one can establish plain error in a bench trial[.]" Majority at 15. I cannot join my colleagues in this sentiment as the presumption that the trial court ignores incompetent evidence and improper arguments is merely a *presumption*. *In re M.L.B.*, 377 N.C. 335, 338 (2021) (emphasis added) ("When a judge sits without a jury, [our Supreme] Court *presumes* that the trial court disregards any incompetent evidence and will affirm the judgment or order if the trial court's findings are supported by competent evidence."). In addressing the rebuttal of such a presumption, we have previously held:

> Respondents next argue the trial court erred in admitting in evidence various hearsay statements, as well as medical documents which allegedly were not properly authenticated. The mere admission by the trial court of incompetent evidence over proper objection does not require reversal on appeal. *See Best v. Best*, 81 N.C. App. 337, 341[] . . . (1986). "Rather, the appellant must also show that the incompetent evidence caused some prejudice." *Id.* In the context of a bench trial, an appellant "must show that the court relied on the incompetent evidence in making its findings." *Id.* at 342[] . . . (citation omitted).

*In re Huff*, 140 N.C. App. 288, 301 (2000), *appeal dismissed, disc rev. denied*, 353 N.C. 374 (2001); *see also State v. Morales*, 159 N.C. App. 429, 433–34 (2003); *In re A.W.* 283 N.C. App. 127, 132 (2022) (citing *Morales*, 159 N.C. App. at 433–34). Preservation—or the lack thereof—does not change the concern regarding the trial

court's reliance on improper evidence or arguments; it merely adds to an appellant's burden to show a higher degree of resulting prejudice. The Majority's dicta, especially in a published decision, risks turning this legal fiction into an irrebuttable presumption—or, at least, introducing unnecessary confusion into our caselaw.

With this proviso in mind, I agree that Defendant has not met his burden to overcome the presumption. While it was not required to do so, the trial court included its jury instructions in this matter and read them aloud at the equivalent of a jury trial charge conference, allowing for the parties to be heard at their conclusion. *State v. Cheeks*, 267 N.C. App. 579, 592–95 (2019) ("Here, the trial court elected to follow a hybrid procedure by adopting 'jury instructions' setting forth the law it would apply to the case, as required in a jury trial[.] . . . We appreciate the trial court's attention to detail and effort to provide this Court with a full understanding of the law applied and the facts it determined to be true. . . . [T]he trial court handled it carefully. The additional procedural steps used by the trial court [in a felony criminal bench trial] are fully within the trial court's discretion, but we note they are not required by the North Carolina Rules of Criminal Procedure or Chapter 15A, Article 73 of North Carolina's General Statutes."), *aff'd*, 377 N.C. 528 (2021). These jury instructions included, *inter alia*, the following:

> Evidence has been received tending to show that at an earlier time a witness made a statement which may conflict or be consistent with the testimony of a witness at this trial. You must not consider such earlier statement as evidence of the truth of what was said at that earlier time

> because it was not made under oath at this trial. If you believe the earlier statement was made, and that it conflicts or is consistent with the testimony of a witness at this trial, you may consider this, and all other facts and circumstances bearing upon the witness' truthfulness in deciding whether you will believe or disbelieve the witness' testimony.
>
> . . . .
>
> You have heard the evidence and the arguments of counsel, if your recollection of the evidence differs from that of the attorneys you are to rely solely upon your recollection. Your duty is to remember the evidence whether called to your attention or not. You should consider all of the evidence, the arguments, contentions, and positions urged by the attorneys, and any other contention that arises from the evidence.
>
> The law requires that the presiding judge be impartial. You should not infer from anything I have done or said that the evidence is to be believed or disbelieved, that a fact has been proved, or what your findings ought to be. It is your duty to find the facts and to render a verdict reflecting the truth.

As a result, the record demonstrates that the trial court did not rely on the out-of-court statements for substantive purposes, nor did it improperly consider the State's closing argument. Defendant's only argument that the trial court improperly relied upon these statements for substantive purposes is that the testimony at trial was not otherwise sufficient to establish the act of cunnilingus; however, I concur with the Majority's determination as to the sufficiency of Zara's testimony to establish the act of cunnilingus. Majority at 14. Further, I agree with the Majority's ultimate holding that "the judge presumably disregarded any personal beliefs purportedly inserted

*MURPHY, J., dissenting in part and concurring in result only.*

into the State's closing argument that pertained to whether Zara was telling the truth." Majority at 17.

On this record, Defendant fails to overcome the presumption that the trial court improperly considered the out-of-court statements for substantive purposes or that the Defendant was prejudiced by the State's closing argument. I respectfully dissent from the Majority's dicta regarding plain error review from a bench trial, but I concur in upholding Defendant's convictions.